**COAST INDIAN COMMUNITY**

v.

**The UNITED STATES.**

**No. 850–71.**

United States Court of Claims.

Feb. 23, 1977.

Art Bunce, California Indian Legal Services, Escondido, Cal., attorney of record, for plaintiff. George Forman, California Indian Legal Services, Oakland, Cal., of counsel.

Hubert M. Crean, Washington, D.C., with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D.C., for defendant. Rembert A. Gaddy, Washington, D.C., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Charlotte P. Murphy, filed January 9, 1976, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, with a minor modification, as hereinafter set forth, it hereby affirms and adopts the said decision, as modified, as the basis for its judgment in this case. It is therefore concluded that, in accordance with the trial judge's recommendation, plaintiffs are entitled to recover the net amount of $47,500 and judgment is so entered for plaintiffs with further proceedings to be held pursuant to Rule 131(c) in order to determine the beneficiaries who are entitled to share in this award and whether interest is awardable.

## OPINION OF TRIAL JUDGE

MURPHY, Trial Judge:

Plaintiffs are members of an unincorporated association known as the Coast Indian Community. They seek damages from the United States in the amount of $54,500, plus interest from April 5, 1966, for an undercompensated taking of their property and a breach of fiduciary obligation owed plaintiffs by the Bureau of Indian Affairs (hereafter BIA), as an agent of the United States.

Plaintiffs assert, as the basis for their claim, that a right-of-way across their reservation, valuable because it provided the most direct access to a large redwood and Douglas fir timbering area, was conveyed by the United States as trustee for the reservation land to the County of Del Norte, California, for a grossly inadequate consideration. According to plaintiffs, the right-of-way, worth approximately $57,000, was sold by the BIA agents for $2,500.

The factual issues in this case concern the valuation of the right-of-way and the validity of consents to the right-of-way sale, allegedly executed by three Coast Indian Community members (two now deceased). The legal adequacy of those consents and the necessity in law for obtaining them are likewise in contention. Three additional questions of law are also in dispute: whether the plaintiffs own a compensable interest in the Resighini Rancheria (hereafter Rancheria); whether the value obtained for the easement by the BIA amounts to a taking of property without sufficient compensation or a breach of fiduciary duty owed to the plaintiffs, or neither; and whether, if relief is forthcoming, the judgment should include interest from April 5, 1966, the date of the sale to Del Norte County (hereafter County).

Trial was held in Eureka, California, for 3 days and the court made an on-site inspection of the land in question, the surrounding timberland, and the lumber processing plant across the Klamath River at Klamath, California. For reasons hereafter discussed, the court holds for plaintiffs.

I

By deed dated January 7, 1938, a tract of land known as the Rancheria was conveyed to the United States:

* * * in Trust for such Indians of Del Norte and Humboldt Counties, in California, eligible to participate in the benefits of the [Indian Reorganization] Act of June 18, 1934 (48 Stat. 984) [25 U.S.C. §§ 461 et seq. (1970)], as shall be designated by the Secretary of the Interior * * *.

The 228-acre site, situated along the south bank of the Klamath River in the County, was purchased by the BIA under the authority of the cited statute, and proclaimed an Indian reservation by the Acting Secretary of the Interior in 1939.[1] Beginning in 1938, at the invitation of an agent of the BIA, certain Indian families of Del Norte and Humboldt Counties took up residence on the Rancheria. Some 13 Indian families of various tribal origins lived there and came to be known collectively, at the BIA's suggestion, as the Coast Indian Community. The Klamath River flooded the Rancheria, which is largely flatland, in December 1964, forcing the relocation of all but two of the families. The two remaining families moved off the land when their homes burned, one in 1969 and the other in 1973. Since the last date, no one has lived permanently on the Rancheria, but most of the Indian families formerly resident there have continued using it for camping and gardening, often staying on the land for extended periods in the summer and fall of the year.

Across the river to the north of the Rancheria is a lumber processing mill of the Simpson Timber Company (hereafter Simpson). To the south of the Rancheria lies a hilly area replete with high quality redwood and Douglas fir timber, timber mostly owned, cut, and processed by Simpson. The BIA issued an annual revocable permit to Simpson on March 26, 1965, allowing Simpson to transport approximately 4 million board feet of timber across the Rancheria. For this privilege, Simpson was charged 25 cents per thousand board feet, the fair rental value of the right-of-way as determined by BIA appraiser Elmer Heisel.

Even before March 1965, however, Simpson and the BIA began discussing the acquisition by Simpson of a permanent right-of-way over the Indian land. BIA agents told Simpson that the latter should have the County apply for a permanent public road easement. The County, having obtained Simpson's agreement to pay all costs of acquiring and building the road sought, applied for and was granted this easement. Pursuant to Heisel's appraisal, the BIA sold the right-of-way now at issue to the County for $2,500 on April 5, 1966. This right-of-way running for 1,934.11 feet along the southern boundary of the Rancheria, with an average width of 50 feet and a total area of 2.06 acres, was eventually turned into a public road by virtue of improvements made by Simpson. It was accepted into the County's road system in 1972.

## II

To determine whether plaintiffs hold a compensable interest in the Rancheria, the court must decide whether the members of the Coast Indian Community were in fact the beneficial owners of the Rancheria. It is undisputed that the United States held title to the Rancheria in 1966 as trustee. However, defendant contends that, as of the date of the right-of-way sale, no individual Indian had been "designated" as the beneficiary of the trust by the Secretary of the Interior, as required by the 1938 deed and the 1939 proclamation.[2]

Dorothy Frye, a widow, testified at trial that in 1938, at the urging of an agent of the BIA, she, her husband William (now deceased), and their three children moved

1. 4 Fed.Reg. 4475 (1939).

2. Plaintiffs contend that defendant may not even raise this issue now, because defendant's failure to deny in the pleadings and pretrial statements that plaintiffs possessed a compensable interest in the Rancheria operated as an estoppel against defendant on this issue. Whether defendant may properly raise this point for the first time in its post-trial brief need not now be decided, in view of the fact that there is evidence sufficient to establish that by April 1966, plaintiffs had been "designated" the beneficial owners of the Rancheria within the meaning of the deed and proclamation.

into a one-room shack on the Rancheria and were the first Indians to settle there. Later, when the donor of the land left, the Fryes moved into the main house. They continued to live on the Rancheria until the main house burned in 1969 and their daughter's house burned in 1973.

The second family arriving at the Rancheria, according to Mrs. Frye, was William Scott and his wife. With the help of William Frye, the BIA then built five houses. The Rancheria group continued to grow until 13 families lived there by 1960, some living in mobile homes they brought with them. Thereafter, the population numbered about 75 people, of which about 50 were children.

The Coast Indian Community was comprised of formerly homeless Indians living on the Rancheria. In March 1964, according to Mrs. Frye, those actually living at the Rancheria were the Dowds, the Fryes, two families named Frank, the Hoffmans, the Jakes, the Jameses, the McCoveys, the Novas, the Proctors, the Scotts, the Wards, and the Brahams. Except for a few husbands, all of these persons were Indians. Most of the husbands worked away from the Rancheria, mainly in the woods for Simpson.

In 1964, all but two houses were swept away by the Klamath River flood and the only residents thereafter were William and Dorothy Frye, their daughter Dorothy Frye Williams, and their families. Although the

BIA agreed to replace the destroyed homes, they could not be built on the Rancheria site, which was determined to be flood plain. Since fires destroyed the remaining homes, the land has been used only in the summer for gardening and camping by seven or eight families, according to Mrs. Frye.

Venola Dowd testified that she moved to the Rancheria on July 4, 1940, at age 14 with her mother, Lena McCovey. She corroborated Mrs. Frye's testimony that 13 families had accepted the BIA's invitation and had taken up residence on the Rancheria before the 1964 flood. Thereafter, only two families lived on the Rancheria. The rest were resettled mainly at Crescent City, California, although three families settled across the Klamath River from the Rancheria. The testimony by Mrs. Frye and Mrs. Dowd stands uncontradicted.

While the 1938 deed and the 1939 proclamation indicate that the Secretary of the Interior would designate the beneficial owners of the Rancheria, no specific procedures for accomplishing such designation were prescribed. Hence, it was not necessary that the designation be made by a formal proclamation, listing all the beneficiaries by name. Moreover, the personnel of the BIA, as subordinates of the Secretary specifically empowered to deal with Indian problems on his behalf,[3] could accomplish the designation.[4]

Thus, in the absence of specifically prescribed designation procedures, the conduct

3. *See* 25 U.S.C. § 1a (1970); Reorganization Plan No. 3, May 24, 1950, 15 Fed.Reg. 3174 (App. to 5 U.S.C. at 530 (1970)).

4. See regulations dealing with "unorganized" California rancherias published on August 13, 1965, at 30 Fed.Reg. 10098, now codified as 25 C.F.R. § 242.1 *et seq.* (1975). These regulations recognize the existence of rancherias not governed by any organic document ("unorganized"), use and occupancy privileges thereon held by Indians without reference made in any written instrument ("informal assignment"), and the right of Indians residing on rancherias for at least 3 years to share in any distribution of rancheria assets under the California Rancheria Act (see note 9 of this opinion), although they did not even hold "informal assignments." 25 C.F.R. §§ 242.2(h), (j); 242.-3(a)(4), (c); and 242.4(b). These rules indicate

that a designation absent formalities, and consisting only in locating Indians on the Rancheria and providing for their needs there, was within the contemplation of the Secretary. If this were his interpretation of the deed and proclamation—that informal locating and provision of assistance suffices to identify "such Indians * * * as shall be designated by the Secretary" and amounts to such designation— no statement of greater formality could be expected. This is perfectly consistent with the Secretary's silence on the matter from 1938 through the mid–1960's, when that silence was broken only in response to duties prescribed in the Rancheria Act, whereupon he drew up a list of Rancheria voters and distributees that included plaintiffs.

of the BIA in locating the Coast Indian Community members on the Rancheria, in acquiescing in their continued presence on and use of the Rancheria for many years, in building houses for them on the Rancheria, and in providing plaintiffs with services usually accorded to Indians living on a reservation.,[5] provides strong and uncontroverted evidence of their designation as the Rancheria beneficiaries within the meaning of the deed and proclamation. On such evidence, designation may be inferred by law. *United States v. Assiniboine Tribe*, 428 F.2d 1324, 1329–30, 192 Ct.Cl. 679, 690 (1970).[6]

Accordingly, the status of plaintiffs as beneficial owners of the Rancheria, entitled to share in the profits and sale proceeds from the right-of-way at issue, has in fact been established.

Defendant has pointed out a notice published in the Federal Register on May 18, 1972,[7] to establish that it was not until January 21, 1967, some 9 months after the right-of-way grant, that the BIA determined those persons who had rights in the Rancheria. Defendant relies on the following language in the notice to establish that the first designation occurred in 1967:

> Notice is hereby given that at the request of all persons who were determined to hold rights, claims, or interests in the Coast Indian Community (Resighini Rancheria), Del Norte County, Calif., under a plan for distribution of assets * * accepted January 21, 1967, said plan for distribution of assets * * * was revoked on January 2, 1972 * * *.[8]

The notice recites only that the distribution plan, drafted pursuant to the California Rancheria Act[9] was accepted by the Secretary of the Interior pursuant to that Act in January 1967.

On its face, this notice leaves ambiguous whether "all persons who were determined to hold rights, claims, or interests" were first designated as such in the notice, or were ascertained previously. The Rancheria Act, however, created a complex procedure for the adoption of distribution plans, such as that mentioned in the notice. Preceding acceptance of the distribution plan by the BIA, the following must occur (in order): a determination of the Indians entitled to vote on any subsequent distribution of reservation assets, an initial election by those persons to decide if a distribution plan is to be drawn up, the creation of the plan, and then an election by the same persons to accept the plan as drawn. Hence, it was not possible that the designation of Rancheria beneficiaries took place as late as the acceptance of the plan in January 1967.

The regulations of the Secretary appearing at 25 C.F.R. § 242.3 (1975), in force beginning August 13, 1965, and throughout 1966, govern rancheria distribution elections pursuant to the Rancheria Act. It is clear from the regulations' language that the persons whose names appear on a voters' list created under the regulations are identical to those fully entitled to share in the property benefits of the Rancheria. Section 242.3(c) expressly limits the list to the members of the "Indian tribe, band, or community * * * associated with the rancheria or reservation." Furthermore, section 242.3(a) includes in the voters' list for an "unorganized rancheria or reservation," the apparent legal status of plaintiffs' Rancheria, not only persons holding

---

5. The authority of the BIA to provide the Indian plaintiffs with free medical care and with homes on an area officially designated as a reservation is unchallenged.

6. While no formal order ever came from the President designating the Assiniboine as occupants of the Blackfoot Reservation, within the terms of an 1874 statute empowering him to determine additional reservation beneficiaries, yet governmental conduct and acquiescence

were deemed sufficient to amount to their designation in law as such, entitling them to live on and share in the benefits of the reservation.

7. 37 Fed.Reg. 10010 (1972).

8. *Id.*

9. Pub.L. 85–671, Act of August 18, 1958, 72 Stat. 619, as amended by Pub.L. 88–419, Act of August 11, 1964, 78 Stat. 390.

"allotments" and "formal assignments" but as well those "who reside on the rancheria or reservation pursuant to an informal assignment" and "[t]hose not in the above categories who have resided for a period of at least three consecutive years * * * on the rancheria or reservation not set aside for a designated group of Indians."

Although the trial record does not include any evidence of a formal designation of plaintiffs as Rancheria beneficiaries, in plaintiffs' post-trial legal arguments, the court's attention was directed to the publication on February 11, 18, and 25, 1966, in The Humboldt Times, a general circulation newspaper printed in Eureka, California, of a list of persons eligible to vote in an election to determine whether a distribution plan should be prepared for plaintiffs' Rancheria. This published notice, which complied with the requirements of section 242.3(d), was published well before the sale of the right-of-way and included the names of the eight individual plaintiffs in the present action.

Plaintiffs have furnished an affidavit from the publisher, attesting to the publication of the notice. This official notice, published in The Humboldt Times for three consecutive weeks, as required by the Rancheria Act and the regulations in order to prepare an asset distribution plan, constitutes a public, official act of the Government, one that is "capable of ready and accurate determination by resort to sources whose accuracy cannot be questioned." The voters' roster as published, evidencing a form of official designation of Rancheria beneficiaries, has therefore been accorded judicial notice by the court. Fed.R.Evid. 201(b)(2); 9 J. Wigmore, Evidence § 2571, at 548 (3d ed. 1940); McCormick, Evidence § 328, at 758 (2d ed. 1972).

Consequently, the publication of a voters' list, as required by section 242.3(d), necessarily constitutes either a designation of reservation beneficiaries or the reaffirmation of a designation already made in the past. From the foregoing, it is concluded that plaintiffs, who like all Coast Indian Community members are beneficial owners of the Rancheria, hold a compensable interest in the reservation land, including the right-of-way at issue.

### III

#### A. *Plaintiffs' view*

■ On the subject of valuation, plaintiffs contend through their appraisal witness, Robert E. Kleiner, that the fair market value of the right-of-way, viewed from facts and circumstances known to a reasonably competent appraiser in 1966, is $57,000.[10] This figure consists of a $50,000 loss-of-profits estimate, plus $7,000 for severance damages. The $50,000 amount relates to right-of-way use fees lost because of the conveyance, fees that Mr. Kleiner said would have been paid to the BIA in trust for plaintiffs by logging companies, particularly Simpson, wishing to bring timber across the Rancheria.[11]

Mr. Kleiner calculated the total fee amount by determining the average annual fee paid or expected to be paid in the immediate future, and then capitalizing the annual fee figure at 10 percent. The average annual fee was determined by Mr. Kleiner through evaluation of the following factors:

(1) Estimates of the total volume of the Simpson timber stand together with a topography and comparative transportation cost analysis, showed that roughly 20 million board feet of timber would annually be removed from the timber area south of the Rancheria and taken to the mill north of the Indian tract for about 20 years, a quantity far in excess of the 1 million board feet per year figure estimated by the BIA.

(2) The same analysis indicated that the most economical route for this timber

---

10. At trial, the court granted plaintiffs' motion to amend the petition relative to the amount of relief sought to conform to the valuation evidence adduced at trial, pursuant to Rule 39(b), in the amount of $57,000.

11. The nearest timber plant was that of the Simpson Timber Company, located across the river from the Rancheria in Klamath, California.

movement crossed the Rancheria right-of-way.

(3) The fair market value for use of rights-of-way in the vicinity by loggers in 1966 was at least 25 cents per thousand board feet per mile or fraction and, given inflationary trends, was probably higher.

(4) The northern segment of the timbering area, the part nearest the Klamath River mill, would be logged first according to prevailing industry practice, and this was in fact done, rather than the contrary as the BIA appraisal had assumed.

(5) Operations at the mill were regular and annually consumed from the timbering area considerably in excess of 1 million board feet in several years preceding the right-of-way sale.

(6) The 25-cent rate was usually supplemented in transactions in the vicinity with a reciprocity arrangement, whereby the party granting the right-of-way would be accorded a similar right to cross the grantee's property, and this element of value in this case should have been assigned a monetary amount since the plaintiffs had no desire for a reciprocal easement over Simpson's land.

The foregoing led Mr. Kleiner to conclude that the typical informed buyer, for use or investment, would have been willing to pay $50,000 for the right-of-way.[12] The $7,000 severance figure relates to the value decrease in the Rancheria, as realty used for recreational, agricultural, and temporary residential purposes, after the establishment of the right-of-way as a public road, carrying a large volume of logging traffic.

Mr. Kleiner is an officer of and stockholder in Western Timber Services, Inc. His occupation is consulting forester, real estate appraiser, land surveyor, and logging engineer. He has registered professional credentials in these fields in California, Oregon, Nevada, and Alaska. He is a member of the Appraisal Institute (M.A.I.) and a past president of the National Association of Consulting Engineers. His formal education consisted of a B.S. (1941) and M.A. (1947) in forestry from the University of Washington College of Forestry. Also, he has completed three courses by the American Institute of Real Estate Appraisers, and has participated in continuing education seminars on appraisal, consulting forestry, logging engineering, and surveying. He has been employed by private clients, industry, state, county, and federal agencies, including the National Park Service, to appraise timber land rights-of-way, land for highway right-of-way acquisition, flood damaged property, recreational property, etc., in various western states including California. His work in the timber land area surrounding Klamath, California, in both Del Norte and Humboldt Counties, California, has extended over more than 20 years.

At trial, Mr. Kleiner's expert qualifications were conceded by defendant. Upon reviewing his testimony, the court determined that he was a good, reliable, credible, highly-qualified, and well-versed expert witness, whose opinion should be accorded great weight and whose testimony was legally and factually well-founded. His expert opinion was undiminished by cross-examination at trial.

## B. Defendant's view

Defendant argues that the average annual fee that the right-of-way was expected to produce, viewed from the standpoint of 1966, amounts to no more than $250. This figure capitalized at 10 percent, is $2,500, which the BIA obtained from the County for the conveyance of the permanent easement.

Defendant relies on the appraisal made by BIA employee, Elmer A. Heisel, Jr., in anticipation of the conveyance. To arrive

12. Mr. Kleiner viewed the fee agreement between the BIA and Simpson for the latter's use of the right-of-way as unrealistically low at 25 cents a timber unit. This rate, based on actual prior use, capitalized, gave a value of $42,000. However, increased timber volume could also justify a value of $100,000 at the same rate. Consequently, taking into consideration that an estimated 400 million board feet of timber would be carried over the right-of-way over a 20-year period, Mr. Kleiner determined the right-of-way's present value of $50,000.

at the $250 income figure, Mr. Heisel reviewed past right-of-way rental receipts, averaging about $1,200 annually over a 2-year period according to BIA records, and then reduced this value to take into account (1) anticipated sporadic logging of the timbering area, and (2) the probability that the segments of the area nearest the mill would be reserved for future or emergency use rather than logged immediately. Accordingly, Mr. Heisel concluded that it was realistic to estimate that 1 million board feet of timber would be transported across the Rancheria right-of-way each year on the average. At 25 cents per thousand board feet (his earlier appraised right-of-way rental value), he felt a $250 yearly income could be expected. Since the right-of-way ran along the boundary of the Rancheria, Mr. Heisel said that no severance damage would be incurred.

Mr. Heisel has been a senior appraiser with the BIA since 1967 and at the time of trial was stationed at Grand Coulee, Washington. He joined the BIA in 1957 as a forester, after 6 years with a lumber company. In October 1960, he became an appraiser and was located at the BIA's Hoopa Valley station until November 1965, when he moved to Sacramento. He has a degree in forestry from the University of Montana. He is a member of the Society of American Foresters and the Society of Farm Managers and Rural Appraisers.

Mr. Heisel's appraisal education consisted of two courses in 1962 and 1966 offered by the Institute of Real Estate Appraisers. Mr. Heisel estimated the number of appraisals he has made at 30 to 40 in the years just after 1960, and 75 to 100 in more recent years of which a maximum of 5 percent concerned rights-of-way, including some across Indian reservations, but with about half having timber as a factor.

The court has concluded that in the land appraisal field, the witness was not well qualified educationally and also was limited in appraisal experience relative to timber land and especially in dealing with rights-of-way acquisitions. According to Mr. Heisel's testimony, the facts he had available to him in reaching his determination and the time he had to develop his valuation report were limited. Hence, he was similarly handicapped in reaching a well-founded appraisal opinion by lack of time and factual material essential to a valid, well-reasoned valuation determination. Consequently, his view that the value of plaintiffs' right-of-way as of April 5, 1966, was only $2,500 is not well founded and is entitled to little weight.[13]

Relative to just compensation value, the Supreme Court stated in *United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 633, 81 S.Ct. 784, 790, 5 L.Ed.2d 838 (1961) that:

The guiding principle of just compensation is reimbursement to the owner for the property interest taken. "He is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236. In many cases this principle can readily be served by the ascertainment of fair market value—"what a willing buyer would pay in cash to a willing seller." *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336. See *United States v. Commodities Corp.,* 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707; *United States v. Cors,* 337 U.S. 325, 333, 69 S.Ct. 1086, 93 L.Ed. 1392. But this is not an absolute standard nor an exclusive method of valuation. See *United States v. Commodities Corp., supra,* at 123, 70

---

**13.** Plaintiffs also point out that the BIA should not have approved in December 1965, Mr. Heisel's appraisal of the right-of-way value, which was made in August 1965. The reason given is that a memorandum dated October 11, 1965, signed by BIA Field Representative Andrew Lathem warned that new roads were being constructed in the interior of the timbering area and that there appeared a likelihood that the right-of-way, originally evaluated for limited timber removal, was marked for heavy logging traffic in the then near future. Plaintiffs assert that this memorandum placed the BIA on actual notice of the inadequacy of Mr. Heisel's August appraisal.

S.Ct. at p. 549; *United States v. Cors, supra*, at 332, 69 S.Ct. 1086; *United States v. Miller, supra*, at 374–375, 63 S.Ct. 2176; *United States v. Toronto Nav. Co.*, 338 U.S. 396, 70 S.Ct. 217, 94 L.Ed. 195.[14]

Plaintiffs' expert, Mr. Kleiner, reached his valuation conclusion in accordance with the foregoing principles properly applied to the facts of this case. Hence, his overall land valuation figure of $50,000 is appropriate and the court so finds.

## C. *Severance damages*

Plaintiffs also seek severance damage compensation. Plaintiffs' expert, Mr. Kleiner, explained that he arrived at $7,000 for severance damages by determining the value of the remaining Rancheria land before the right-of-way was granted in April 1966, and subtracting from it the value of the remaining land of the Rancheria after the right-of-way was transferred. The difference or reduction in fair market value, thus represented severance damages.

*Land Outside of Right-of-Way*

| | | |
|---|---|---|
| 1. | Before right-of-way grant | $75,000 |
| 2. | After right-of-way grant | 68,000 |
| 3. | Reduction in value (Severance) | $ 7,000 |

Mr. Kleiner explained his rationale in trial testimony. He stated that the property located outside of the right-of-way was used for recreational, agricultural, and residential purposes. He estimated that the property was better suited for those purposes before the road was taken, since after

the taking there were very few restrictions on trucks using the road. Except for weight, there were few restrictions on the number of trucks, the number of times the trucks could use the road, and the amount of oiling, or surface dust control required. The absence of these restrictions would reduce the value of the land for recreation, agriculture and temporary residential use.

Defendant offered no evidence to rebut this testimony and valuation, which would be indicative of a change or lack of change in the value of the remainder of the tract after the conveyance of the right-of-way.

Severance damage has been legally defined as the deterioration in value of the owner's remaining property caused by the transfer of property rights to a part of the land.[15] In this connection, the Supreme Court stated in *United States v. Miller*, 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L.Ed. 336 (1943) that:

> If only a portion of a single tract is taken, the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract.[16]

In the instant case, we feel there is an insufficient showing that the value of plaintiffs' remaining property was in fact sufficiently diminished by the taking of the right-of-way to support a finding of compensable severance damage. Consequently, severance value compensation is inappropriate here. For this reason, the court determines that severance damages should not be granted here.

---

**14.** *See also United States v. Fuller*, 409 U.S. 488, 490–91, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973); *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973); *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); *Rocca v. United States*, 500 F.2d 492, 494–95, 205 Ct.Cl. 275, 280–81 (1974); *Osage Nation v. United States*, 97 F.Supp. 381, 403, 119 Ct.Cl. 592, 632–33, *cert. denied*, 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672 (1951); *Rogue River Tribe v. United States*, 89 F.Supp. 798, 803, 116 Ct.Cl. 454, 478 (1950), *cert. denied*, 341 U.S. 902, 71 S.Ct. 610, 95 L.Ed. 1342 (1951); *Iowa-Wisconsin Bridge Co. v. United States*, 84 F.Supp. 852, 859, 114

Ct.Cl. 464, 497 (1949), *cert. denied*, 339 U.S. 982, 70 S.Ct. 1020, 94 L.Ed. 1386 (1950).

**15.** *United States v. 121.20 Acres of Land*, 333 F.Supp. 21, 26 (E.D.N.C.1971), in which severance compensation was awarded for the decline in value of the 80 home acres remaining after the former owner's farmland tract adjoining a forest preserve was taken by the Government to add to that preserve. *See also* 4A Nichols', Eminent Domain, §§ 14.1[3] and 14.-21, at 14–31 to 14–35 and 14–49 to 14–53 (rev. 3d ed. 1975).

**16.** *See also Campbell v. United States*, 266 U.S. 368, 369, 371, 45 S.Ct. 115, 69 L.Ed. 328 (1924).

## IV

The pivotal legal question in this case concerns the proper grounds for relief from the action of the BIA in selling the right-of-way for such a nominal amount as $2,500, which represents only about 5 percent of its true value.[17] The issue is whether the BIA's act constituted an inverse taking of property compensable under the fifth amendment, or, alternatively, a breach of the Government's fiduciary obligation as trustee for the Coast Indian Community.

### A. *Taking of property*

█ In order for a taking to occur by virtue of the act of an agent of the Government, the agent's act must be accomplished within the scope of his statutory or delegated authority, and it must invade private property rights in such a manner and degree that compensation may fairly be said to be due under the fifth amendment. The character of the interference must of course be judged on the facts of each case, but a determination that there was an invasion requires at the minimum a showing that private property rights existed in the claimant.

### 1. Authority and the Indian consents

The first element in establishing a taking consists of showing that the governmental agent's act which is said to amount to an inverse condemnation was within the scope of the agent's authority. Absent such a showing, there can only be a tortious trespass, for which the fifth amendment does not require compensation by the sovereign.[18] Evidence demonstrating the existence of the requisite authority in the agent must be supplied by plaintiff.[19] Appropriations of Indian lands by the acts of Government agents, which were mistaken or tortious in origin, have been held to be takings only if Congress was informed of the encroachments and ratified them, expressly or by inaction,[20] or the President, who historically possesses power over public lands, ratified the Government's acquisition of the lands, with the full knowledge and acquiescence of Congress.[21]

The facts of the instant case show neither authority in the local office of the BIA to make the right-of-way conveyance that it did, nor ratification of the conveyance by any party possessing the power to give it effect. The conveyance was approved 9 years ago at the level of the Sacramento area office of the BIA, and there is no indication in the record that the matter was called to the attention of Congress. This is not sufficient to infer a ratification by Congress, due to long-standing effect, high official approval, or actual knowledge.

17. The court has found as a fact that a reasonably diligent appraisal, conducted just prior to the sale in 1966, should have produced a value figure for the right-of-way more than 20 times the amount of the BIA's appraisal. See Part III of this opinion.

18. *United States v. Goltra*, 312 U.S. 203, 208–09, 61 S.Ct. 487, 85 L.Ed. 776 (1941); *Portsmouth Co. v. United States*, 260 U.S. 327, 330, 43 S.Ct. 135, 67 L.Ed. 287 (1922); *United States v. North American Transp. & Trading Co.*, 253 U.S. 330, 334, 40 S.Ct. 518, 64 L.Ed. 935 (1920); *Societe Cotonniere Du Tonkin v. United States*, 171 F.Supp. 951, 959–60, 145 Ct.Cl. 426, 441–42 (1959), *cert. denied*, 361 U.S. 965, 80 S.Ct. 594, 4 L.Ed.2d 45 (1960).

19. *Porter v. United States*, 496 F.2d 583, 204 Ct.Cl. 355 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *Housing Corp. v. United States*, 468 F.2d 922, 925, 199 Ct.Cl. 705, 711 (1972).

20. *Shoshone Tribe v. United States,* 299 U.S. 476, 489, 494–96, 57 S.Ct. 244, 81 L.Ed. 360 (1937), *United States v. Creek Nation*, 295 U.S. 103, 107, 109–11, 55 S.Ct. 681, 79 L.Ed. 1331 (1935), *United States v. Pueblo of Taos*, 207 Ct.Cl. 53, 515 F.2d 1404 (1975), *United States v. Northern Paiute Nation*, 490 F.2d 954, 957–58, 203 Ct.Cl. 468, 474–75 (1974), and *Seminole Nation v. United States*, 102 Ct.Cl. 565, 618–20 (1944), *cert. denied*, 326 U.S. 719, 66 S.Ct. 24, 90 L.Ed. 426 (1945).

21. *Confederated Salish & Kootenai Tribes v. United States*, 401 F.2d 785, 787–89, 185 Ct.Cl. 421, 425–28 (1968), *cert. denied*, 393 U.S. 1055, 89 S.Ct. 691, 21 L.Ed.2d 696 (1969). In this case, lapse of time was also a factor, for the Government had consistently treated the appropriated land as its own (and part of a national forest) since the late 19th century.

It is claimed that the BIA conveyed the right-of-way pursuant to the authority vested in the Secretary of the Interior by 25 U.S.C. § 323 (1970), enacted in 1948, and delegated by him to the BIA and its local agencies.[22] This is the sole authority cited in support of the conveyance, and the only one known to permit it. Section 323, it is true, conferred broad powers on the Secretary "to grant rights-of-way for all purposes" across Indian lands held in trust by the United States. But section 324 of the same title, and regulations promulgated under section 323, codified at 25 C.F.R. §§ 161.1 *et seq.* (1967), restricted those powers by requiring that consents of Indian occupants be obtained in certain circumstances before making a conveyance pursuant to section 323. The local BIA officials were legally bound to follow the statutory[23] and regulation-based[24] procedures in the course of executing the conveyance, and any conveyance in violation of those procedures necessarily amounted to an unauthorized, void, and wrongful act, for which the sovereign bears no responsibility under the fifth amendment.

■ The BIA violated the restrictions contained in the statute and regulations, for although it was required by them to obtain the consents of a majority of the adult members of the Coast Indian Community before conveying the right-of-way, it failed

to do so. Section 324, as well as section 161.3(b) and (c) of the regulations in force in 1966, required that the consents of the individual Indian "owners or owner" be obtained before an exercise of authority under section 323 could take effect.[25] The only exception to the foregoing applicable in this case permitted the consents of the holders of a majority of the interests in the land concerned to stand in lieu of universal consent.[26]

By their terms, sections 324 and 161.3(b) limit the consent requirement to situations involving lands that are "owned" by their Indian occupants. But this concept of ownership includes beneficial ownership, and it has already been established that Coast Indian Community members are beneficial owners of the Rancheria.[27] Although the language of both the statute and the regulation, which parallel each other, is ambiguous on this point, the ambiguity is resolved, in favor of the determination that beneficial ownership was intended to be within the language of the provisions in force in 1966, by a reading of a clarifying revision of the right-of-way regulations in 1968 and 1971.[28] A comparison of the regulations operative in 1966 with the later revisions reveal that the rewritten language was promulgated solely to clarify the predecessor provisions, not to alter the right-of-way grant scheme (at least as to consent re-

---

**22.** *See* 25 C.F.R. § 161.1(a) (1975).

**23.** The provisions of sections 323 and 324 must be read together, for they constituted the first and second sections, respectively, of the same enactment, Act of February 5, 1948, ch. 45, 62 Stat. 18.

**24.** *Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Jones v. United States,* 203 Ct.Cl. 544, 550 (1974). Section 323 provides that conveyances are to be made pursuant to it "under such conditions as [the Secretary] may prescribe"; section 328 of the same title vests the Secretary with power to issue regulations to carry section 323 into effect.

**25.** Section 324 expressly forbids the use of section 323 powers with respect to tribal lands without the consent of "the proper tribal officials." It implicitly forbids such use over other

Indian lands absent consent, by limiting or dispensing with the need for consent in specified instances.

**26.** Sections 324(1) and 161.3(c)(2). The provision in sections 324(4) and 161.3(c)(5) dispensing with consents altogether when the Secretary finds that the number of interest holders is in practicality too great to permit the gathering of consents clearly does not apply here, for the number of Coast Indian Community members was not so large, nor was any finding to that effect shown to have been made.

**27.** See Part II of this opinion.

**28.** 25 C.F.R. §§ 161.1 *et seq.* were generally revised by 33 Fed.Reg. 19803, Dec. 27, 1968, and section 161.3 was further amended by 36 Fed.Reg. 14183, July 31, 1971.

quirements). In view of this clarifying objective, the subsequent effective date does not detract at all from the revisions' relevance to an interpretation of the superseded provisions.[29] The revised regulations provide that:

> * * * no right-of-way shall be granted over and across any individually owned lands, * * * without the prior written consent of the owner or owners of such lands * * * .[30]

and define "individually owned land" to include "land or any interest therein held in trust by the United States for the benefit of individual Indians."[31] Since the Rancheria falls within this description of "individually owned land,"[32] consent of the Coast Indian Community members was a prerequisite to the authority in the BIA to make the right-of-way conveyance, under a reasonable interpretation of the statute and of the regulations in force at the time of the conveyance actually made.

■ The Coast Indian Community members' interests in the Rancheria being undivided and equivalent, the consents of a majority of the adult members are needed to satisfy the statute and regulations.[33] An undated consent form placed in evidence stated that the signators agreed to the conveyance of a right-of-way 50 feet wide and 1,731 feet long[34] for such consideration as the BIA deemed appropriate, and was allegedly signed by William Frye (now deceased), Minnie Frank (now deceased), and Theodore Jake, who testified that the signature on the consent form was not his.[35] The evidence shows that the Coast Indian Community in April 1966 was comprised of 13 families, and so a majority vote of the adult members required responses from more than the three persons whose names appear on the supposed consent form. The consent document offered in this case—undated, unwitnessed, and a generally irregular legal document—is thus insufficient to constitute the landholders' consent required by the statute and regulations.[36]

**29.** *Victory Constr. Co. v. United States*, 510 F.2d 1379, 206 Ct.Cl. 274 (1975); *Hills Transp. Co. v. United States*, 492 F.2d 1394, 204 Ct.Cl. 51 (1974). *See also Bethlehem Steel Corp. v. United States*, 511 F.2d 529, 206 Ct.Cl. 122, *cert. denied*, 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975).

**30.** 25 C.F.R. § 161.3(b) (1975).

**31.** *Id.* § 161.1(b).

**32.** The United States acquired the Rancheria, according to the 1938 deed and the 1939 proclamation, pursuant to section 5 of the 1934 Indian Reorganization Act, 25 U.S.C. § 465 (1970). Section 465 provided that the title to land acquired under it " * * * shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired * * * ." Section 479 of the same title, originally section 19 of the 1934 Act, defined "tribe" for the purposes of the Act as " * * * any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." The Coast Indian Community does not come within this definition, for it is not a tribe in the anthropological sense of the term, nor is it organized or a pueblo, nor were its members residing together on one reservation before or at the time of the Rancheria acquisition. The Rancheria, then, was not acquired for a tribe, leaving only the possibility under the Act that it was purchased for individual Indians. The deed and proclamation say nothing to contra-

dict this. Thus, the land was taken in trust for the individual Coast Indian Community members.

**33.** See note 26 of this opinion.

**34.** The actual conveyance was 1,934.11 feet in length.

**35.** There was also documentary evidence of still more consents, purporting to approve transfer of a roadway to the County in 1954. An all-important map identifying the road was not attached to the document, as the document indicated it was. This evidence undoubtedly relates to a public road which already ran through the eastern part of the Rancheria in 1966, with which the right-of-way at issue here connects, but which comprises no part of that right-of-way. The probative value of this consent document is negligible and this evidence has therefore been accorded no weight.

**36.** It has been suggested that Frye's consent alone is adequate, since all Coast Indian Community members but two, no longer resided permanently on the Rancheria in 1966, and because Frye was the husband of one of those residents and the father of the other. This cannot be seriously considered, for no valid legal reason has been offered for ignoring the beneficial interests of the nonresident Coast Indian Community members, nor has there been produced even a power of attorney or

The court must therefore conclude that the BIA's conveyance of the right-of-way in the absence of the required consents was an act beyond the authority of the Government agents involved. It was wrongful as to the Coast Indian Community members, and so, there being no evidence of a ratification of this wrongful act by the United States, the sovereign cannot be held liable under the fifth amendment, as no constitutional taking occurred.

2. Legal interest in the property appropriated

Another element in establishing a taking is the demonstration that the claimant possessed private property rights in the subject matter allegedly taken. The present case is distinguishable from instances in which lands possessed by Indian claimants under aboriginal title, recognized title, or fee patent were held to have been taken.[37] Here, plaintiffs did not hold legal title to the Rancheria, for they only became beneficiaries of the Rancheria's conveyance to the United States by designation of the BIA.[38]

B. *Breach of trust*

Next, we must consider whether a breach of trust by the United States occurred when the BIA sold the right-of-way for

only about 5 percent of its fair market value and whether plaintiffs are entitled to recover, in damages for breach of trust, the difference between the full value of the land conveyed and the sale proceeds actually received.

That the Government owed a fiduciary duty to the members of the Coast Indian Community in the course of its management of the Rancheria can hardly be disputed. The Rancheria was held in trust by the United States for the benefit of the Coast Indian Community.[39] Section 323, under which the BIA purported to sell the right-of-way, contemplated the conveyance of rights-of-way by the Secretary on behalf of Indian groups as an exercise of the Government's authority as guardian or trustee over Indian property.[40] These facts, viewed in light of the decisions of the Supreme Court and of this court establishing the Government's role as a fiduciary regarding Indian property,[41] require that the actions of the Government in this case, as accomplished through its agents, the local officials of the BIA, must be judged according to the standards applicable to a trustee engaged in the management of trust property.

The United States, when acting as trustee for the property of its Indian wards, is held to the most exacting fiduciary stan-

---

other instrument or explanation giving to Frye the right or ability to execute a consent for another adult person.

**37.** *See, e. g., United States v. Creek Nation*, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935); *Confederated Salish & Kootenai Tribes v. United States*, 437 F.2d 458, 193 Ct.Cl. 801 (1971); *Tlingit & Haida Indians v. United States*, 389 F.2d 778, 182 Ct.Cl. 130 (1968).

**38.** See Part II of this opinion.

**39.** 25 U.S.C. § 465 (1970). *See* note 32 of this opinion.

**40.** S.Rep. 823, 80th Cong., 2d Sess., 1948 U.S. Code Cong.Serv., pp. 1033, 1036; *Three Affiliated Tribes v. United States*, 390 F.2d 686, 691, 182 Ct.Cl. 543, 553 (1968); *Klamath & Modoc*

*Tribes v. United States*, 436 F.2d 1008, 1015, 193 Ct.Cl. 670, 684–85, *cert. denied*, 404 U.S. 950, 92 S.Ct. 271, 30 L.Ed.2d 267 (1971).

**41.** *Seminole Nation v. United States*, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); *Navajo Tribe of Indians v. United States*, 176 Ct.Cl. 502, 507, 364 F.2d 320, 322 (1966); *Oneida Tribe v. United States*, 165 Ct.Cl. 487, 494, *cert. denied*, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 554 (1964); *Menominee Tribe v. United States*, 101 Ct.Cl. 10, 19 (1944). *See also United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); *Cheyenne-Arapaho Tribes v. United States*, 206 Ct.Cl. 340, 512 F.2d 1390 (1975); *Pyramid Lake Paiute Tribe v. Morton*, 354 F.Supp. 252 (D.D.C.1973); *Manchester Band of Pomo Indians v. United States*, 363 F.Supp. 1238 (N.D.Cal. 1973).

dards.[42] These standards extend equally to the local agents of the BIA, and the responsibility of the trustee includes accountability for the acts of those agents, even where wrongful and unauthorized.

A trustee is under a duty to exercise due care and prudence to preserve the trust property. If the trustee is guilty of negligence in his dealings with that property, the trustee is liable to the beneficiary for any loss thereon.[43] Mere evidence of a disparity between the value that the trustee realized in disposing of trust property and the fair market value at the time of that disposition, as later independently appraised, is not sufficient to establish negligence or other breach on the part of the trustee. However, demonstration of fraud or gross negligence in the actual conduct of the United States as trustee, or in the conduct of its agents, will make the Government liable for damages in breach of trust growing out of the fraud or negligence.[44] Further, a showing that the value realized from the trust property was so far below its fair market value as to constitute fraudulent conduct, gross negligence, or other breach of a fiduciary duty, will suffice without more to establish the trustee's liability.[45]

The evidence in the instant case shows gross negligence on the part of the trustee's agent, the local office of the BIA, in attempting to ascertain a value for the right-of-way and causing plaintiffs to be damaged to the extent of the difference between the nominal sale price, $2,500, and the fair market value of the conveyance, $50,000. The defects in defendant's appraisal were so substantial and numerous as to make it thoroughly inadequate and incompetent. These defects include: (1) Mr. Heisel's breakline was incorrect, and far more sections of timbering area would have been harvested for removal over plaintiffs' right-of-way than the four sections that the BIA appraiser assumed; (2) the estimate of the volume to be harvested each year from the foregoing sections was incredibly low, and was so even taking only the four sections into account; (3) the appraisal ignored rising right-of-way fees in the area as well as the fact that those fees were usually coupled with reciprocal exchanges, without which the fees would reasonably have been even greater; (4) the difficulty and expense of obtaining alternate routes for timber removal was not considered; and (5) the estimated volume of timber traffic was at extreme variance with immediate past and present figures on such at the time the appraisal was made. Plaintiffs' expert accurately characterized the BIA valuation as deficient on these grounds, and Mr. Heisel, called as the Government's expert, failed to support his appraisal against this attack. Further, it is of no comfort to the Government's case that a memorandum signed by one of the BIA's own field representatives, Andrew Lathem, disclosed to the Sacramento area office an anticipated volume of timbering south of the Rancheria at great vari-

42. *United States v. Mason, supra* note 41; *Seminole Nation v. United States, supra* note 41; *Ottawa Tribe v. United States*, 166 Ct.Cl. 373, 380, *cert. denied*, 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964).

43. 2A Scott, Trusts §§ 174, 176 (3d ed. 1967).

44. *Creek Nation v. United States*, 97 Ct.Cl. 602 (1942), *cert. denied*, 318 U.S. 787, 63 S.Ct. 784, 87 L.Ed. 1046 (1943); *Seminole Nation v. United States*, 92 Ct.Cl. 210 (1940), *cert. denied*, 313 U.S. 563, 61 S.Ct. 841, 85 L.Ed. 1523 (1941).

45. *Klamath & Modoc Tribes v. United States, supra* note 40, 193 Ct.Cl. at 684–86, 436 F.2d at 1015; *Three Affiliated Tribes v. United States, supra* note 40, 182 Ct.Cl. at 551, 390 F.2d at 690. This court's observation in cited cases that very great disparity between the market value and the sale price on conversion of an asset to cash in itself evidences breach of trust was made with reference to the Indian Claims Commission Act. However, this court cited as the basis for that proposition two cases which predated that Act, *Creek Nation v. United States, supra* note 44, and *Seminole Nation v. United States, supra* note 44. Hence, it is concluded, at least under the facts of this case, that the Act is not necessary to a finding of liability for breach of trust based solely on the incredible size of the disparity between BIA's price and the actual market value.

ance with the assumptions of the appraisal finally relied upon. The memorandum, received by the BIA after Mr. Heisel conducted his appraisal but before the latter was approved as the basis for the right-of-way sale, noted the increased road construction activity in the interior of the timbering area, evidencing expectation of greater harvesting of the area in the near future.

This court in *Chippewa Indians of Minnesota v. United States*, 91 Ct.Cl. 97 (1940), allowed recovery under similar circumstances for a detrimentally incompetent appraisal, although the value-price disparity was not as aggravated as in the present case. There, the Secretary of the Interior appointed 35 appraisers to make a valuation study of the Chippewa's land, which was being conveyed to the United States under a treaty and act of Congress for later sale by the Government to the account of the Indians. Twenty-five of these appraisers were plainly unqualified, and the skilled foreman was not even allowed to review their work. Since this appraisal resulted in a realization of only 50 percent of the actual value of the land sold, recovery was given in the amount of the deficiency. A statute was of course involved, which set the high standard of care to be exercised in the appointment of, and in the work by, the appraisers. However, a recovery is equally in order for a detrimentally incompetent appraisal where a standard of care is present similar to that set in the statute in *Chippewa*. That is the case here, in view of the exacting fiduciary standards to which the Government must be held.

The evidence also shows a differential of 2,000 percent between the actual value and the price received, a disparity that on its face strains the normal legal concepts of fiduciary responsibility, even when considered most favorably to the trustee. This is the clearest possible case of value received:

> * * * so far below the then fair market value * * * as to amount to * * * gross negligence, or some other breach of its fiduciary obligations on the part of the Government.[46]

The 2,000 percent differential is far indeed from a "mere disparity."[47]

Accordingly, plaintiffs are entitled to recover for the Government's negligent conduct in the valuation of the right-of-way for sale to the County, as evidenced by the gross inadequacy and incompetence of the appraisal employed by the BIA, and by the very wide disparity between market value and price.[48] The United States failed to act here in a manner that met the high fiduciary standards imposed upon it when it deals with Indian property as a trustee. It must therefore respond in damages for breach of its trust obligations, in an amount equal to the full market value that should have been realized upon the right-of-way sale, less the sum actually paid to the BIA for the conveyance.

## V

Plaintiffs seek interest from the date of the right-of-way sale to the date of payment of judgment in this litigation. First, they contend that back interest is always

---

**46.** *Three Affiliated Tribes v. United States, supra* note 45.

**47.** *Id.* See *Nez Perce Tribe v. United States*, 176 Ct.Cl. 815 (1966), *cert. denied*, 386 U.S. 984, 1015, 87 S.Ct. 1285, 18 L.Ed.2d 233 (1967), in which a disparity of 33⅓ percent was found to be a violation of "fair and honorable dealings" under the Indian Claims Commission Act. Similar violations were found under that Act in *Sac & Fox Tribe v. United States*, 167 Ct.Cl. 710, 340 F.2d 368 (1964), for a disparity between a $1.24 payment and a $3 value per acre, and in *Miami Tribe v. United States*, 150 Ct.Cl. 725, 281 F.2d 202 (1960), *cert. denied*, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961), for the

realization of only 38 percent of the property's market value.

**48.** In *United States v. Pueblo of Taos, supra* note 20, this court indicated that recovery in a valuation dispute must be predicated upon, not simple opinion differences or mere disparities, but on definite proof that a breach of trust has occurred. The imposition of a very high standard of care in fulfilling a certain duty, whether prescribed by statute or precedent, may well affect the point at which breach is determined to exist, but it cannot in itself alter the test for breach where land value is the prime issue.

given on a taking, citing note 23 in *Klamath & Modoc Tribes v. United States*, 193 Ct.Cl. 670, 686, 436 F.2d 1008, 1015–16, *cert. denied*, 404 U.S. 950, 92 S.Ct. 271, 30 L.Ed.2d 267 (1971). Alternatively, plaintiffs contend that they are equally entitled to interest if liability is based on a breach of trust, citing G. Bogert, Handbook of the Law of Trusts at 608 (3d ed. 1952), in which it is said that the damage measure for breach of trust is the difference between the trust capital and income accounts as they would have existed if the trust were performed and as they do exist on account of the breach.

■ It is true that 4 percent simple interest is usually awarded from the date of taking as part of the just compensation award required by the Constitution, where a determination of a taking is made. However, it is well established that interest from the date that the claim arises until date of judgment is not awarded as part of a recovery for breach of trust. *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309 (1975) *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *Klamath & Modoc Tribes v. United States, supra; Three Affiliated Tribes v. United States*, 182 Ct.Cl. 543, 390 F.2d 686 (1968); and *Confederated Salish & Kootenai Tribes v. United States*, 175 Ct.Cl. 451, *cert. denied*, 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966). The only exception to this rule is that prescribed by statute or express agreement. There is no agreement to this effect in this case. *See United States v. Mescalero Apache Tribe, supra; Chippewa Indians v. United States*, 91 Ct.Cl. 97 (1940). Relative to a statutory exception, since 1929 25 U.S.C. §§ 161 and 161a (1970) have prescribed payment of 4 percent simple interest on proceeds of the sale of Indian trust lands on deposit in the United States Treasury, and these provisions have been the basis for recovery of interest on judgments in this court, when yet other statutes do not impair their effect.[49] Further, when funds do exist in the hands of the Government as trustee for the Indians, the provisions have been interpreted as a floor for yield on investments.[50]

At the present time, there is nothing in the record to indicate the disposition of the $2,500 actually received in payment for the right-of-way, or the status of any other funds of the Coast Indian Community. If the payment received was held in the U.S. Treasury in a trust account for Coast Indian Community members, or if it can be shown that part of a larger realized amount would have been so held, it may be that interest should be awarded under sections 161 and 161a. However 25 C.F.R. § 161.14 (1975) (25 C.F.R. § 161.15 (1967)) instructs that the proceeds of a right-of-way sale are to be disbursed to or for the account of the Indian beneficiaries. This interposes the possibility that Coast Indian Community members received ratable shares of the sale proceeds immediately, that the proceeds were held in trust accounts, or that some other disposition of the proceeds was made by the BIA "to or for the account of" the members.

Therefore, further proceedings under Rule 131(c)(2) are appropriate, and the amount of the recovery will be determined accordingly.

---

49. *See Confederated Salish & Kootenai Tribes v. United States*, 186 Ct.Cl. 947 (1968); *Confederated Salish & Kootenai Tribes v. United States*, 175 Ct.Cl. at 456–57.

50. *Cheyenne-Arapaho Tribes of Oklahoma v. United States, supra* note 41, 206 Ct.Cl. at 347–48, 512 F.2d at 1393–94; *Manchester Band of Pomo Indians v. United States, supra* note 41, 363 F.Supp. at 1243–44.