877 F.2d 1550
 Lindsey Barlen ROGERS, Steven L. Abel, Maxine Naomi Panno
Anderson, Lawrence Apaletea, Snyder Brown, Carmen L. Chavez,
Edward D. Chavez, Elizabeth C. Chavez, James M. Chavez,
Hattie Clark, Althea Conway, Julia Lawrence Cook, Ralph E.
Curry, Anita Davis, Donald L. Davis, Glenn Davis, Ronald L.
Davis, Franklin G. Deviney, Deanna Cooper Dick, Wesley Dick,
Jessie Cluette Durant, Jenny Freeman, Delbert Gibson, Marie
Guernsey, Phillip W. Guernsey, Allen Hanks, Jr., Eva Harvey,
Lucandra J. Horn, Florence Sam Howe, Melissa Kennedy, Brian
Lynch, Robert E. Lynch, Candace A. Marchant, Howard J.
Marchant, Richard A. Marchant, Sylvia Mase, Vernadine H.
McLain, Zachary H. Pierce, Frank Quartz, Ricky Quartz, Avery
Sam, Ellery Sam, Everett Sam, Flora G. Sam, Freddie Sam, Kip
E. Sam, Milton E. Sam, Ray Morris Sam, Reggie Sam, Rita N.
Sam, Robert John Sam, Stephanie Sam, John M. Saulque, Jackie
D. Selestewa, Michelle D. Selestewa, Opal Daisy Winnemucca
Stanley, John Thacker, Jr., Bob Thompson, Marian Tom, John
Vipont, Bob Henry Visbach, Lorene Walters, Gary Watson,
Leander Danny Watson, Rachael Watson, Lena Weldon, Lila
Weldon, Ray Weldon, Roy Williams and Marie Sam Wilson,
Plaintiffs-Appellants,
v.
The UNITED STATES of America, Cecil B. Andrus, Secretary of
Interior of the United States of America, William Hallett,
Commissioner of Indian Affairs, Curtis Geiogamah, Acting
Area Director of the Bureau of Indian Affairs, Robert
Hunter, Superintendent of the Western Nevada Agency of the
Bureau of Indian Affairs, Defendants/Cross-Appellants.
 No. 88-1468.
 United States Court of Appeals,
Federal Circuit.
 June 15, 1989.
 
 Peter J. Sferrazza, Reno, Nev., argued, for plaintiffs-appellants.
 John T. Stahr, Dept. of Justice, Washington, D.C., argued, for defendants/cross-appellants. With him on the brief were James L. Byrnes, Deputy Asst. Atty. Gen. and Martin W. Matzen.
 Before FRIEDMAN and RICH, Circuit Judges, and BENNETT, Senior Circuit Judge.
 FRIEDMAN, Circuit Judge.
 
 
 1
 These are an appeal and a cross-appeal from a judgment of the United States District Court for the District of Nevada that certain individuals were entitled to participate in a prior award of just compensation for the taking by the United States during the last century of Indian lands. Rogers v. United States, No. R-80-63 BRT, Memorandum Opinion (D.Nev. Nov. 13, 1987) (hereinafter "Second Trial Decision"). We affirm in part, vacate in part, and remand to the district court for further proceedings in accordance with this opinion.
 
 
 2
 * A. Between 1961 and 1964, the Indian Claims Commission awarded the Northern Paiute Indian Nation a total of $20,375,000 as just compensation for the taking by the United States between 1853 and 1872 of the Northern Paiute aboriginal homelands. In 1961 and 1968, Congress appropriated funds to pay these awards and placed the funds in trust pending the formulation of a distribution plan. Supplemental Appropriations Act, Pub.L. No. 87-332, 75 Stat. 733 (1961); Supplemental Appropriations Act, Pub.L. No. 90-608, ch. 12, 82 Stat. 1190 (1968).
 
 
 3
 In subsequent legislation, Congress established general guidelines for the distribution of any Indian judgment funds, and directed the Secretary of the Interior to prepare and submit to Congress a distribution plan for funds appropriated to pay Indian Claims Commission judgments. Distribution of Judgment Funds Act, Pub.L. No. 93-134, Sec. 2, 87 Stat. 468 (1973); 25 U.S.C. Sec. 1402 (Funds Act). The Funds Act also required the Secretary to promulgate within 180 days rules and regulations "to implement" the Act, and provided:
 
 
 4
 Among other things, such rules and regulations shall provide for adequate notice to all entities and persons who may receive funds under any Indian judgment of all relevant procedures pursuant to this chapter concerning any such judgment.
 
 
 5
 25 U.S.C. Sec. 1406(a).
 
 
 6
 The Secretary submitted to Congress a distribution plan for the Northern Paiute judgment fund in July 1974. The plan provided for per capita distribution to "lineal descendants of Northern Paiute Indians." 25 C.F.R. Sec. 41.3(t)(1)(ii) (1976). Enrolled members of other tribes, who might also qualify as Northern Paiutes, but who were to receive comparable compensation through those tribes, were excluded from the distribution. 25 C.F.R. Sec. 41.3(t)(2). In a letter accompanying the plan, the Secretary noted expected difficulties in notifying eligible Northern Paiutes, since lineal descendants were scattered among several currently recognized tribes and "there are, in addition, numerous individual Northern Paiute descendants who are not affiliated with any Federally recognized groups today." Rogers v. United States, No. R-80-63 BRT, Order, slip op. at 3 (D.Nev. Aug. 3, 1981) (hereinafter "1981 Order").
 
 
 7
 On April 16, 1975, after a period of notice and comment, the Secretary published in the Federal Register regulations governing the enrollment of Northern Paiutes for the distribution. 40 Fed.Reg. 17,022 (Apr. 16, 1975). In order to expedite the payments to eligible Northern Paiutes, the regulation was made effective immediately instead of in 30 days. Enrollment commenced immediately, and terminated 180 days later, on October 13, 1975. 25 C.F.R. Sec. 41.3(t)(3) (1976). The regulations provided for a "place to obtain forms of application of enrollment, the place where they are to be filed and the time within which they must be filed." 1981 Order at 4, citing 25 C.F.R. Sec. 41.3(t).
 
 
 8
 The Secretary never promulgated the regulation governing the giving of notice to potential recipients of funds under Indian judgments that the Funds Act required.
 
 
 9
 The Bureau of Indian Affairs did, however, send letters to "Nevada and California Newspapers, television stations and radio stations" "soliciting your help in this search and ... enclosing a public service announcement." The announcement indicated that more than $20 million was ready for distribution and that eligible persons of Northern Paiute ancestry must apply prior to the closing date of October 13, 1975. Letters were also sent to 97 different organized Indian groups in 24 states and the District of Columbia.
 
 
 10
 Since the closing date for enrollment was a federal holiday, the Assistant Secretary for Indian Affairs determined on March 2, 1978 that applications received by October 14, 1975 would be considered timely. Due to confusion regarding implementation of this change, the deadline was later extended to any applications signed or dated by October 14 and received by October 24.
 
 
 11
 Provision also was made for individuals who had attempted but failed to qualify for participation in a comparable award made to the Washoe tribe because they could not establish tribal membership, but who could prove lineal descendancy from a Northern Paiute Indian. These individuals were permitted to use the filing date of their Washoe application as the filing date for their Northern Paiute application. The deadline for applications for Washoe enrollment had been January 31, 1975.
 
 
 12
 This procedure was adopted in response to a letter from the chairman of the Washoe Tribal Council, which pointed out to the Bureau of Indian Affairs (BIA) that persons rejected for Washoe enrollment should be able to preserve their rights to Northern Paiute enrollment. In that letter, which is not in evidence, the chairman allegedly gave the BIA the names of individuals in that category. A later letter from the chairman is in the record and contains lists of affected individuals.
 
 
 13
 The BIA received approximately 12,000 enrollment applications, which it individually reviewed. To assist in the review, the BIA requested help from various Indian tribes, and a BIA representative visited a number of Indian reservations and obtained information used in making eligibility determinations.
 
 
 14
 As a result of this review, the BIA determined that approximately 9,000 individuals were entitled to participate in the fund. The fund was distributed on April 2, 1980. Each participant received $5,162.52.
 
 
 15
 B. Shortly before the distribution was made, two Northern Paiute applicants, Rogers and Howell, both of whose applications had been denied for late filing, filed suit in the district court seeking to participate in the award. They alleged that the government's failure to promulgate regulations governing the giving of notice, as the Funds Act required, had contributed to their failure timely to enroll and thus was responsible for their failure to share in the fund.
 
 
 16
 The district court set aside the rejection of Rogers' and Howell's applications "for late filing." 1981 Order at 7. The court held that despite "extensive efforts to give notice," the congressionally mandated "directive [concerning notice was] ignored." 1981 Order at 5. The court noted that "the regulations for adequate notice might have provided for specific notice by publication, posting, or otherwise to" "an identifiable Paiute colony at Yerington, Nevada," of which Rogers and Howell were members. Id.
 
 
 17
 The Court of Appeals for the Ninth Circuit affirmed in part and reversed in part. Rogers v. United States, 697 F.2d 886 (1983). The court held that "Interior breached its duty as a trustee by failing to comply with section 1406(a)" (the notice regulation provision). 697 F.2d at 890. The court also sustained the district court's reversal of the dismissal of the applications as untimely. The court, however, concluded that that did not "end our inquiry," since the "Government asserts that all appropriated funds have been allocated." Id. at 889. The court remanded for the district court to consider "the appropriateness of an award of damages" for breach of trust. Id. at 890. The court stated:
 
 
 18
 Beneficiaries seeking damages for a breach of trust must not only show that a trust exists and has been breached but also that the breach caused the beneficiaries' injury. [Citation omitted.] On remand, appellants have the burden of showing that Interior's failure to comply with procedures required by [25 U.S.C.] section 1406(a) resulted in their failure to receive notice.
 
 
 19
 Id.
 
 
 20
 C. In August 1982, approximately five months before the Ninth Circuit opinion, additional plaintiffs filed a second action asserting claims similar to those in the first suit. Following the remand by the court of appeals, these two actions were consolidated for trial.
 
 
 21
 After trial, the district court entered judgment for $5,162.52 each, in favor of a number of the claimants, and dismissed the claims of the remainder.
 
 
 22
 The government stipulated to the entry of judgment in favor of Howell. Rogers died prior to the retrial, and the district court dismissed his claim because a personal representative had not been timely substituted for him, as Rule 25(a)(1) of the Federal Rules of Civil Procedure required. The court also dismissed the claims of twelve other plaintiffs who had died and for whom no personal representative had been substituted.
 
 
 23
 The government stipulated to the entry of judgment in favor of 20 claimants whom the government "would have been able to contact by mail." The district court entered judgment in their favor because they all were "Northern Paiute lineal descendants, who on October 13, 1975, were eligible to participate in the judgment distribution, but did not file applications because although they were enrolled members of recognized Northern Paiute successor tribes, the Defendant failed to send them adequate notice by mail." Rogers v. United States, No. R-80-63-BRT, Memorandum Decision, slip op. at 2 (D.Nev. July 7, 1987) (hereinafter "Second Judgment").
 
 
 24
 The district court also entered judgment in favor of 63 "Northern Paiute lineal descendants who, on October 13, 1975, were eligible to participate in the judgment distribution but did not file applications for lack of advance notice due to Defendant's failure to provide regulations for adequate notice." Id. at 3. The court entered judgment in favor of four claimants who were "Northern Paiute lineal descendants, eligible to participate in the judgment distribution on October 13, 1975, and who filed timely applications but were denied distribution due to Defendant's error in classifying them as Shoshone Indians," id., and in favor of thirteen others. Second Trial Decision at 18. The court dismissed the remaining claims on various grounds, including failure of the claimants to file timely applications or to demonstrate their Paiute ancestry. Id., and Second Judgment at 4.
 
 
 25
 Finally, the court rejected the contention by the successful claimants that they were entitled to prejudgment interest. The court stated: "This is an action for damages for breach of trust. There is no trust fund in existence. Under Title 28 U.S.C. Sec. 2516(a) interest is not allowable." Second Trial Decision at 17.
 
 II
 
 26
 A. All of the claimants in whose favor the district court entered judgment contend that, in addition to the $5,162.52 they received, they were entitled to interest on that amount from the date of the original distribution of the Northern Paiute fund in April 1980. They state that the government held the funds appropriated to make the Northern Paiute payments as trust funds, note that 25 U.S.C. Sec. 161a required the government to invest all funds it held as trustee for Indian tribes in public interest-bearing debt securities, and conclude that because they were wrongfully excluded from the Northern Paiute trust fund, they are entitled to the interest the money would have earned.
 
 
 27
 The government states, and the claimants do not deny, that the funds Congress appropriated to pay the Northern Paiute awards were invested and drew interest until their distribution, and that the $5,162.52 distributed to each participant in the fund included interest earned to the date of distribution. Since each of the appellants received that same amount, they received the interest earned by the trust fund to the time of distribution.
 
 
 28
 What the appellants are seeking is additional interest from the time of distribution to the date of judgment. The district court held, however, that because the fund had been distributed to the beneficiaries in 1980, there were no trust funds for the Northern Paiutes that could have earned interest.
 
 
 29
 "In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award." Library of Congress v. Shaw, 478 U.S. 310, 316, 106 S.Ct. 2957, 2961, 92 L.Ed.2d 250 (1986); United States v. Mescalero Apache Tribe, 207 Ct.Cl. 369, 518 F.2d 1309, 1311 (1975) ("interest on a claim against the United States can be allowed only under a contract, treaty, or an Act of Congress expressly providing for the payment of interest.") (Emphasis in original.) There is no contract, treaty, or Act of Congress that the appellants have cited, or of which we are aware, that expressly, or even by implication, provides for the payment of interest on the awards the district court made to the appellants.
 
 
 30
 B. The appellants challenge certain procedural rulings of the Secretary.
 
 
 31
 1. They contend that the Secretary improperly made his April 1975 regulations governing the enrollment of Northern Paiutes effective immediately instead of in 30 days and prejudiced them by advancing the date for filing enrollment applications by 30 days. The district court held that although the "waiver of the thirty-day deferment effective date was illegal" because expedition of payment of the Northern Paiutes did not justify the waiver, the appellants were "estopped to assert any rights flowing from the Secretary's violation of 5 U.S.C. Sec. 553(b)." Second Trial Decision at 10.
 
 
 32
 Assuming arguendo that the district court correctly held that the waiver of the 30-day effective date was improper, we agree with the court that the appellants' delay bars them from now belatedly challenging that action. As the district court noted, the appellants "waited until after irrevocable action had been taken--the roles [sic] had been closed, and the Judgment Funds fully distributed" before filing suit more than seven years after the publication of the regulations in the Federal Register. Id.
 
 
 33
 2. The appellants also challenge the Secretary's retroactive extension of the filing date for Northern Paiute applicants and permitting rejected Washoe claimants to use the filing dates of their Washoe applications. As the district court pointed out, it is doubtful that the appellants, who were excluded from the Northern Paiute fund distribution, had standing to challenge the actions of the Secretary that permitted other claimants to share in the fund. The issue is whether the appellants were properly excluded, not whether other claimants were properly included.
 
 
 34
 In any event, we have no basis for disagreeing with the district court's conclusion that the extensions of the enrollment deadline "were made in an effort toward an 'equitable' solution of gross misunderstandings caused by administrative errors." Second Trial Decision at 6. The court ruled that these extensions were authorized to prevent injustice and were neither "arbitrary" nor "unreasonable." Id. at 7. Similarly, the court justifiably held that treating the Washoe filing as an effective filing for Northern Paiute enrollment was "a proper exercise of discretion" and "reasonable and not arbitrary." Id. at 8.
 
 
 35
 3. The appellants argue that the Secretary did not comply with his obligation under 25 U.S.C. Sec. 1403 and 25 C.F.R. Sec. 41.7 to consult with tribal leaders with regard to all aspects of a distribution plan. The district court held that there was "no evidence that failure to comply with [those provisions] affected any of the plaintiffs." Second Trial Decision at 11.
 
 
 36
 The Secretary recognized the difficulty in identifying the widely dispersed Northern Paiutes who were entitled to enrollment for the fund. The district court noted that the Secretary's tribal organization specialist for the area "request[ed] assistance" from "all the Paiute Nation organized tribes ... in preparation of an accurate roll," and that "[s]he met with several of the tribal representatives and used their information." Id. The court concluded that "[u]nder the circumstances" there had been "substantial compliance with the directive of the regulation." Id. We agree.
 
 
 37
 4. The appellants contend that the BIA should have waived the enrollment deadline to avoid "hardship and gross injustice," as 25 C.F.R. Sec. 41.8(b) allows and Sec. 42.9 suggests. The decision whether to waive the filing deadline--a deadline the regulations require, 25 C.F.R. Sec. 41.3(a)--is within the Secretary's discretion. We cannot say the Secretary abused his discretion in refusing to grant a waiver here.
 
 
 38
 C. Finally, the appellants challenge the factual determinations of the district court that certain claimants either failed to establish their Northern Paiute ancestry or to pursue timely applications for enrollment.
 
 
 39
 1. The Sam Family. The district court found that these sixteen appellants' applications were untimely because "[t]he date of mailing is uncertain" and they were actually filed on November 10, 1975. Second Trial Decision at 15. This was seventeen days after the extended October 24, 1975 filing deadline. On direct examination, when asked whether the package was mailed in September, Freddie Sam testified, "Right around there. Like I say, I'm not too sure."
 
 
 40
 The factual basis for the court's finding on filing was that the Bureau of Indian Affairs had recorded November 10 as the date on which it received the applications. The Sam family challenges this finding on the ground that the applications were mailed in a single package, which might have been "mistaken" by the postal service as a parcel or "could have been bypassed" by the Bureau of Indian Affairs as something other than applications. They contend that the applications either were delayed in the mail or were stamped as received long after actual receipt. Such speculative contentions provide no basis for overturning the district court's finding, which is not clearly erroneous.
 
 
 41
 2. Frank and Ricky Quartz. The district court found that these claimants failed to show that their applications were timely filed. That finding is not clearly erroneous.
 
 
 42
 The Bureau of Indian Affairs has no record of having received their applications. These claimants allege that their applications were timely filed by their sister, Flora Rambeau, who was included in the original distribution. Ms. Rambeau testified that she mailed their applications with hers, but that, in a responsive letter, the Bureau of Indian Affairs required their birth certificates. She was unable to produce the letter. This evidence does not invalidate the district court finding that these claimants had not shown timely filing.
 
 
 43
 3. Wesley Dick. Wesley Dick timely applied for enrollment on October 10, 1975. His application was rejected for failure to establish Paiute ancestry. The letter of rejection, which he received on August 11, 1977, stated that he could appeal this decision if he supplied additional evidence within 30 days.
 
 
 44
 By letter dated December 7, 1977, Mr. Dick supplied such evidence. He stated that he had delayed responding because he did not realize that his simultaneous application for Washoe enrollment would not entitle him to the cash distribution that the Northern Paiutes would receive. The Secretary rejected his appeal as untimely. We agree with and affirm the district court's ruling that this rejection was not arbitrary, capricious, or an abuse of discretion.
 
 
 45
 4. John Saulque. His application for enrollment was rejected as untimely. The district court rejected his claim because, although it appeared that he had died, no motion to substitute his personal representative was filed. In this appeal there is no challenge to the finding that he died and that there was no substitution of his personal representative. We therefore affirm the denial of his claim.
 
 
 46
 5. John Vipont. His claim was rejected because he never filed an application for enrollment in the distribution. He argues that his advanced age and admitted inability to hear or communicate with Bureau of Indian Affairs personnel should excuse this failure. The district court correctly held that this does not constitute sufficient "evidence to support the case of John Vipont." Second Trial Decision at 17.
 
 
 47
 6. The Smart Bat Descendants. Ten of the appellants, all descendants of Topsy Smart Bat, challenge the district court's denial of their claim for failure to prove Northern Paiute ancestry. The district court's finding was based on the fact that they had not shown that Topsy Smart Bat's mother, Maggie Smart Bat, was a Northern Paiute. These appellants contend that several other lineal descendants of Maggie Smart Bat had been enrolled by the Bureau of Indian Affairs as Northern Paiutes and had received their distributions.
 
 
 48
 Zeta Marie Chavez, one of these ten appellants, testified that her sister, Nevika Watson Smith, and her brother, James Watson, Jr., and their children, all of whom had identical ancestors, "got theirs." Moreover, Ms. Chavez's first cousin, Velma Batt Farmer, was apparently enrolled and received a distribution based on the identical evidence that the district court rejected as insufficient to establish these appellants' Northern Paiute ancestry.
 
 
 49
 The record shows that Zeta Marie Chavez's original application, which was received on October 16, 1975, was rejected as untimely. Following the subsequent extension of the filing deadline to October 24, the Bureau of Indian Affairs attempted to notify her of the reactivation of her file.
 
 
 50
 The BIA sent her the notification by certified mail to the address on her original application. The letter was returned unopened to the agency. On the returned envelope is inscribed a notation that is illegible on the copy contained in the joint appendix. Ms. Chavez' BIA file also contains an undated letter from Ms. Chavez to the BIA giving her new Stockton, California, address and inquiring about the progress of her application for enrollment and those of her six children.
 
 
 51
 Considering all the circumstances shown by the record, including the BIA's apparently inconsistent treatment of the descendants of Maggie Smart Bat, we cannot at this time uphold, as not clearly erroneous, the district court finding that these ten appellants have not established their Northern Paiute ancestry. We shall therefore vacate the judgment of the district court against these appellants and remand their cases to the district court for further proceedings in accordance with this opinion. In so doing, we express no opinion on whether these appellants are entitled to judgment or whether the BIA's apparent failure to give Ms. Chavez actual notice of the reactivation of their claims was a breach of trust. These are matters for the district court to determine on the remand.
 
 
 52
 7. The Nookey Buckskin Descendants. These seven appellants are all lineal descendants of Nookey Buckskin. The district court denied their claim based on its finding that their applications "were not timely." Second Trial Decision at 14.
 
 
 53
 Originally, nine of Mr. Buckskin's descendants had been denied enrollment both for untimely filing and for their failure to show that Mr. Buckskin was a Northern Paiute Indian. After trial on Mr. Buckskin's tribal affiliation, the court found that "the evidence proves that Nookey Buckskin, their ancestor, was a Paiute Indian." Id. at 13. Judgments were entered in favor of two of the nine claimants, Dorothy Marchant and Neva Rose Visbach, because both were "entitled to the moratorium on the filing deadline which had been established for rejected Washoe applicants." Id. at 13-14. The basis for this moratorium was explained in a Letter from the Commissioner of Indian Affairs to the Phoenix Area Director (April 30, 1976) as follows:
 
 
 54
 As the Washoe Tribal Chairman indicated in his letter dated October 10, 1975, there was an informal agreement between this office and the Washoe Tribe that if the Washoe Tribe would file an application for that class consisting of rejected Washoe applicants of Northern Paiute ancestry before the October 13, 1975, deadline, we would consider such applications as may be filed by rejected Washoe applicants of Northern Paiute ancestry as timely filed. Although the Washoe Tribal Chairman did not file the 'class application' on the appropriate form, we consider his letter of October 10, 1975, to be an application on behalf of the above-specified class of rejected Washoe applicants.
 
 
 55
 The district court noted that "[t]he letter of Chairman Frank of the Washoe Tribe is not in evidence." Second Trial Decision at 8, n. The record contains a "follow-up" letter from Chairman Frank to Superintendent Hunter of the BIA with three appended lists. List B is described as "Paiute applicants (research shows no Washoe blood)," and contains the names of Dorothy Smith Marchant and Neva Rose Buckskin Visbach. At oral argument, the Buckskin descendants described this list as covering those Northern Paiute applicants for whom the filing deadline was waived based on the informal agreement with Chairman Frank.
 
 
 56
 Of the seven claimants whom the district court rejected for untimely filing, three appear on this list (Mary P. Guernsey, Philip W. Guernsey, Jr., and Bob H. Visbach), and three are relatives of Dorothy Smith Marchant (Candace Marchant, Howard Marchant, and Richard Marchant). The seventh claimant, Hattie Clark, is elsewhere in the record described as never having filed an application with the BIA.
 
 
 57
 In view of this evidence, we cannot sustain, as not clearly erroneous, the finding of the district court that the applications of Mary P. Guernsey, Philip W. Guernsey, Jr., Bob Henry Visbach, Candace Marchant, Howard Marchant, and Richard Marchant were not timely filed.
 
 
 58
 We shall therefore vacate that finding and remand their cases to the district court to determine whether they were entitled to a waiver of the filing deadline under the moratorium for "rejected Washoe applicants of Northern Paiute ancestry." We shall affirm the judgment of the district court rejecting as untimely the claim of Hattie Clark.
 
 III
 
 59
 In its cross-appeal, the government challenges the district court's judgment in favor of 63 of the claimants, on the ground that the court failed to follow the mandate of the court of appeals in the prior appeal that on remand the appellants were required to show that "Interior's failure to comply with the procedures required by section 1406(a) resulted in their failure to receive notice." 697 F.2d at 890. In entering judgment in favor of these claimants, the district court found only that although the claimants were "eligible to participate in the judgment distribution," they did not timely "file applications for lack of advance notice due to Defendant's failure to provide regulations for adequate notice." Second Judgment at 3.
 
 
 60
 The district court thus did not find that, or explain how or why, the Secretary's failure to promulgate the required statutory notice regulations "would or would not have given notice to any plaintiff." Abel v. United States, No. R-80-63-BRT, Order at 2 (D.Nev. May 15, 1986). Instead, the court apparently presumed that the failure to promulgate the notice regulations was the cause of the claimants' failure timely to file.
 
 
 61
 The 63 claimants in whose favor the district court entered judgment were apparently derived from the 62 plaintiffs listed on Plaintiff's Exhibit 2, Trial Transcript at 11-12 (March 10, 1987), who the government stipulated were "lineal descendants of Northern Indian Paiute Nation, and are otherwise eligible to participate in the Northern Paiute Judgment funds, except for the fact that they did not submit applications ... because they did not receive actual notice" and that the BIA "had no knowledge of their existence." Id. at 5-6. In the district court's judgment in favor of the 63 claimants, one person from the stipulated list does not appear (Josephine Peterson); and two persons not on the list appear in the judgment (Christopher Secakuku, Edred Secakuku).
 
 
 62
 The breach of trust that the court of appeals held the government had committed was the Secretary's failure to promulgate the notice regulations in accordance with the statutory directive. In order to recover for that breach of trust, these claimants must show that "[t]hese are all injuries proximately caused by the breaches of trust shown here ... and, accordingly, are included within the range of proper recovery." Duncan v. United States, 229 Ct.Cl. 120, 667 F.2d 36, 47-48 (1981). These claimants did not appear on the lists of enrolled members of Paiute successor tribes that were readily available to the government. The government contends that these claimants have not met their burden of showing that they would have received actual notice if the government had complied with the statute.
 
 
 63
 In these circumstances, the portion of the judgment of the district court in favor of these 63 claimants cannot stand. We shall vacate that portion of the judgment and remand the case for further proceedings on the issue of causation. On the remand the district court also should consider the claims of the inconsistently listed Josephine Peterson, Christopher Secakuku and Edred Secakuku.
 
 
 64
 The claimants presented no evidence on whether there were notice procedures known and available to the government that might have provided them with notice, or whether they would have received such notice. We express no opinion on whether, as these claimants contend, mail notification to the 70,000 members of various Indian tribes shown on the California tribal rolls was practicable, reasonable, or likely to be effective.
 
 
 65
 The claimants and the government should be permitted to offer evidence on the causation issue. If the claimants cannot establish the necessary causation, they cannot recover.
 
 CONCLUSION
 
 66
 1. The judgment of the district court is affirmed insofar as it
 
 
 67
 a. denied interest on the awards from April 2, 1980 to the date of judgment;
 
 
 68
 b. rejected the appellants' claims of procedural irregularities discussed in part II-B of this opinion;
 
 
 69
 c. denied the claims of Avery Sam, Ellery Sam, Everett Sam, Flora G. Sam, Freddie Sam, Kip E. Sam, Milton E. Sam, Ray Morris Sam, Reggie Sam, Rita N. Sam, Robert John Sam, Ronald Sam, Stephanie Sam, Melissa Sam Kennedy, Delilah Marie Sam, Marie Sam Wilson, Frank Quartz, and Ricky Quartz for failure to timely file; of Wesley Dick, John Saulque, John Vipont, and Hattie Clark.
 
 
 70
 2. The judgment of the district court is vacated insofar as it denied judgment in favor of Mary P. Guernsey, Philip W. Guernsey, Jr., Bob H. Visbach, Candace Marchant, Howard Marchant, Richard Marchant, Zeta Marie Chavez, Carol Chavez, Carlos Chavez, Carmen Chavez, Edward Chavez, Elizabeth Chavez, James Chavez, Gary Watson, Leander Watson, and Rachel Watson, and awarded judgment in favor of Rita Moore Anderson, Celestina Chavez, Sheryle Chavez-Shaw, Delia Small Collins, Shirley Eagle, Lisa Esponda, Stella Fields, Jenny Freeman, Alfred Higgins, Woodrow Higgins, David Harris, Joy Harris, Linda Harris, Loni Harris, Kathryn Jackson, Marian Hoaglen, K.C. Larose, Lois Larose, Ann Marie Lee, Joanne Sanchez Marsh, Stephen McCloud, Eugene Peterson, Nathaniel Pocatello, Donald Ramos, Elton L. Ramos, Robert Ramos, Guy Franklin Raymos, Jack Raymos, Kathleen Sue Raymos, Marla Louise Raymos, Robert E. Raymos, Robert E. Raymos 2d, William L. Raymos, George Ross, Delilah Marie Sam, Ronald Sam, Shawnie R. Sammaripa, Ferron Secakuku, Homey Secakuku, Josephine Secakuku, Jerry Scott, Jr., Anthony Stone, Donna Street, Kenneth Street, Levina Street, Norman Street, Grant Thomas, Jack Thomas, Lois Thomas, Bernard Unhassobiscay, Catherine Unhassobiscay, Gracienne Unhassobiscay, Jean Baptiste Unhassobiscay, Sarah Unhassobiscay, Marlin Washington, Joseph Weldon, Angelina Whiterock, Audrey Winap, Kathleen Winap, Marvin Winap, Mary Winap, Christopher Secakuku, and Edred Secakuku, and the case is remanded to the district court to reconsider its awards, or denial of awards, to those individuals (and to Josephine Peterson) in accordance with this opinion.
 
 COSTS
 
 71
 No costs.
 
 
 72
 AFFIRMED IN PART, VACATED IN PART, and REMANDED.