Jessie SHORT, et al., Plaintiffs,

v.

The UNITED STATES, Defendant,

and

The Hoopa Valley Tribe of Indians,
Defendant–Intervenor.

No. 102–63.

United States Court of Federal Claims.

July 6, 1993.

William C. Wunsch and Michael Greenberg, San Francisco, CA, and William K. Shearer, San Diego, CA, for plaintiffs.

Pamela S. West, U.S. Dept. of Justice, Washington, DC, for defendant.

Thomas P. Schlosser, Seattle, WA, for defendant-intervenor.

## OPINION

MARGOLIS, Judge.

Three issues remain: first, the defendant has raised the question whether the plaintiffs' counsel have a conflict of interest that should affect their representation in this litigation; second, the defendant has moved for partial summary judgment on the question whether the plaintiffs are entitled to recover for a 1991 per capita distribution from the United States to the Hoopa Valley Tribe; third, the defendant has moved for summary judgment on various disputed issues regarding the accounting narrative that will accompany the judgment. After considering the briefs and hearing oral argument on these issues, the court ruled from the bench on the first two issues. The court ruled that (1) the plaintiffs' counsel do not have a conflict of interest; and (2) plaintiffs are not entitled to damages arising out of the 1991 per capita distribution. This opinion explains the court's decisions.[1]

## FACTS

The essential facts of the *Short* case are as follows. The United States, through the Bureau of Indian Affairs ("BIA") in the Department of the Interior, keeps trust accounts of funds belonging to some Indian Tribes and Reservations. One of these Reservations is the Hoopa Valley Reserva-

---

**1.** The court found genuine issues of material fact in the accounting narrative issues and denied the defendant's motion for summary judg-ment. *Short v. United States*, No. 102–63 (Fed. Cl. filed Apr. 5, 1993) (order).

tion ("the Reservation"). Through sales of timber and other means over the years, the Hoopa Valley Reservation earned money. Periodically, the United States made per capita distributions of the income earned from one portion of the Reservation exclusively to Hoopa Valley Tribe members. Many Indians living on the Hoopa Valley Reservation, however, were not members of the Hoopa Valley Tribe.[2] *See generally, Short v. United States*, 202 Ct.Cl. 870, 873–74 (1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1981, 40 L.Ed.2d 313 (1974) (*Short I*).

In this litigation, over 3,000 non-Hoopa Valley Tribe Indians sued the United States, alleging that the per capita distributions violated the United States' trust obligations to them. The plaintiffs alleged that the BIA should have made per capita distributions to all of the Indians of the Hoopa Valley Reservation, not just to Hoopa Valley Tribe Indians. *Id.*, 202 Ct.Cl. at 874. In 1973, the Court of Claims held the United States liable for damages to thousands of Indians for discriminatory per capita distributions made since 1958. *Id.*

Since 1973, the Court of Claims and this court have wrestled with issues that define the scope of the United States' liability. The courts have developed standards for identifying those Indians who are entitled to recover, articulated principles for quantifying damages, addressed questions related to plaintiffs who have died, determined whether plaintiffs are entitled to prejudgment interest and set the rates for prejudgment interest.[3] The huge number of plaintiffs has made this process long and extremely complex.

Meanwhile, after the 1973 liability decision, the BIA continued to make per capita payments only to Hoopa Valley Tribe Indians. After the 1973 decision, the BIA began to distribute only thirty percent of the unallotted Reservation income because it estimated that Hoopa Valley Tribe members comprised thirty percent of the Indians of the Reservation. The BIA retained the remaining seventy percent of the unallotted Reservation income in an escrow fund. This fund came to be known alternatively as the "*Short* escrow fund" or the "seventy percent fund." The fund grew to over $60 million. The plaintiffs claimed that they were entitled to the entire escrow fund. *Short IV*, 12 Cl.Ct. at 44. However, in a 1987 decision, this court held that the fund did not belong to the *Short* plaintiffs. Instead, the fund, still held in the U.S. Treasury, was subject to the discretion of the Secretary of the Interior. If the Secretary handled the monies in the fund contrary to law, then the plaintiffs could be entitled to damages. *Id.*

While this court focused on remedying past unlawful per capita payments, Congress attempted to settle ongoing disputes over who was entitled to the *Short* escrow fund and who was entitled to future Reservation income. In 1988, Congress passed the Hoopa–Yurok Settlement Act, Pub.L. No. 100–580, 102 Stat. 2924 (1988), *codified at* 25 U.S.C. § 1300i to 1300i–11. ("Settlement Act" or "the Act").

The Settlement Act divided the former Hoopa Valley Reservation into two smaller reservations, known as the Hoopa Valley Reservation and the Yurok Reservation. § 2. The Act required the Secretary to take the *Short* escrow fund, add other funds to it, and name the resulting fund

---

**2.** Many who were not members of the Hoopa Valley Tribe were descended from members of the Yurok Indian Tribe.

**3.** Previous published decisions in the *Short* litigation include *Jessie Short, et al., v. United States*, 202 Ct.Cl. 870, 884, 486 F.2d 561, 568 (1973), *cert. denied*, 416 U.S. 961 (1974) (*Short I*) (establishing liability); *Jessie Short, et al. v. United States*, 228 Ct.Cl. 535, 550–51, 661 F.2d 150, 158–59 (1981), *cert. denied*, 455 U.S. 1034, 102 S.Ct. 1738, 72 L.Ed.2d 153 (1982) (*Short II*) (directing the trial judge to develop standards to

determine which plaintiffs were "Indians of the Reservation" entitled to recover); *Jessie Short, et al. v. United States*, 719 F.2d 1133, 1143 (Fed. Cir.1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984) (*Short III*) (denying defendant's motion to dismiss, clarifying the basis for the court's jurisdiction, and affirming the qualification standards); *Short, et al. v. United States*, 12 Cl.Ct. 36 (1987) (*Short IV*) (establishing a formula for determining the proper measure of damages and interest to qualified plaintiffs).

the "Settlement Fund." § 4(a)(1). Pursuant to the Act, the Secretary then apportioned the Settlement Fund between the Hoopa Valley Tribe and the Yurok Tribe, roughly in proportion to the number of Indians in each tribe.[4] § 4(c)-(d). The Secretary created a list, called the "Settlement Roll," of all Indians of the Reservation who were alive when the Settlement Act was enacted and who were not members of the Hoopa Valley Tribe. § 5.

After these initial distributions, the Act authorized Congress to contribute $10,000,-000 to the Settlement Fund. § 4(e). The Act then required the following distribution of the money remaining in the Fund: (1) lump-sum payments to Indians who did not elect to join the Yurok Tribe or the Hoopa Valley Tribe; and (2) Indians who were wrongfully left off the Settlement Roll. Any remaining funds went to the Yurok Tribe. §§ 6(d), 7(a).

Section 7 of the Act proscribed the BIA and the Tribes from making any per capita distributions from the apportioned funds to individual tribal members for 10 years, except for one $5,000 per capita distribution to Hoopa Valley Tribe members. § 7(b). On April 15, 1991, the Hoopa Valley Tribe authorized a $5,000 per capita distribution to the members of the Hoopa Valley Tribe. No Indians of the Reservation outside of the Hoopa Valley Tribe shared in that per capita distribution.

## DISCUSSION

First, defendant raised the question whether plaintiffs' counsel have a conflict of interest which would disqualify counsel from this litigation. Second, the parties dispute whether the court should include the April 15, 1991 per capita distribution in the final judgment.

*Conflict of Interest*

▉ Defendant alleges that the plaintiffs' counsel sought to acquire a pecuniary interest that conflicts with the plaintiffs' interests in this litigation. The alleged conflict of interest arose out of counsel's efforts to get paid for their representation in this case. In *Heller, Ehrman, White & McAuliffe, et al. v. Lujan,* No. 91–2012 (D.D.C. decided Sept. 6, 1991), *rev'd,* 992 F.2d 360 (D.C.Cir.1993), plaintiffs' counsel claimed attorney's fees from the Settlement Fund under the common-fund doctrine. The common-fund doctrine is an equitable doctrine that permits a litigant or attorney, who recovers a common-fund for the benefit of persons other than himself or his client, to recover fees from the fund as a whole. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). The doctrine prevents the unjust enrichment of persons who obtain the benefit of the lawsuit without contributing to its cost. *Id.* Counsel argued that their work led to the creation and distribution of the Settlement Fund, which benefited their clients and other qualified Indians who were not their clients.

The district court in *Heller, Ehrman* concluded that the escrow fund was a common fund and that its creation was the result of plaintiffs' counsel's efforts. That court awarded attorney's fees to plaintiffs' counsel from the apportionments that Congress mandated from the Settlement Fund: (1) 6.5% of the apportionment due the *Short* plaintiffs, which is the same percentage fee in counsel's contract with their clients; (2) 25% of the apportionment due other qualified Indians who are not *Short* plaintiffs; and (3) 25% of the apportionment that was placed in an account for benefit of the Yurok Tribe. The attorney's fee award totalled some $10 million. The court stated that it believed counsel were entitled to such an award because of their "selfless efforts" over the thirty years "that they fought this case without any compensation whatsoever."

The decision was reversed by the D.C. Circuit Court of Appeals on the grounds that the U.S. District Court lacked subject matter jurisdiction. *Heller, Ehrman,* 992

---

**4.** The description of the Settlement Act in this opinion is illustrative only for resolving the issues immediately before the court. The court makes no findings as to the amounts that eventually were distributed pursuant to the terms of the Settlement Act. The court also draws no conclusions as to the fairness or adequacy of those distributions.

F.2d at 361. Regardless of the reversal, this court must determine whether counsel's efforts in the *Heller, Ehrman* litigation created a conflict of interest that should disqualify them from this litigation.

The defendant theorizes that, by bringing the *Heller, Ehrman* suit, counsel sought a pecuniary interest in the Settlement Fund, and that such an interest would have conflicted with the *Short* plaintiffs' interest in the former *Short* escrow fund. The alleged conflict of interest stemmed from (1) the plaintiffs' claim for damages from the April 15, 1991 per capita distribution; and (2) the fact that the plaintiffs previously argued that they were entitled to the entire escrow fund. Defendant also asserts that the plaintiffs' counsel argued theories before the district court that contradict the theories they presented on behalf of the *Short* plaintiffs in this court.

The parties disagree as to which set of rules of professional conduct to apply. Rule III, Appendix F of the Rules of the Court of Federal Claims states that the court has adopted the American Bar Association Model Rules of Professional Conduct. Regardless of which rules apply, however, the court finds that counsel did not seek a pecuniary interest adverse to the interests of their clients.[5]

First, defendant characterizes the plaintiffs' claim for damages arising out of the April 15, 1991 per capita distribution as a claim to a portion of the escrow fund that was distributed to Hoopa Valley Tribe Indians. The plaintiffs' claim did not create a conflict of interest, however, because plaintiffs' counsel did not seek an interest in the funds that went to the Hoopa Valley Tribe. Through the common-fund doctrine, counsel would be entitled to a percentage of the disbursements to *beneficiaries* of their work. *Boeing*, 444 U.S. at 478, 100 S.Ct. at 749. Neither the Hoopa Valley Tribe nor its members are beneficiaries of counsel's efforts. Therefore, under the common-fund doctrine, plaintiffs' counsel could not have acquired an interest in monies going to the Hoopa Valley Tribe or its members.

Second, defendant alleges that the interest that plaintiffs' counsel's sought in the Settlement Fund was equivalent to an interest in the former *Short* escrow fund, and that plaintiffs have previously argued that they are entitled to the entire escrow fund. It is true that, prior to 1987, the plaintiffs claimed a right to the entire escrow fund. This court rejected that claim in 1987. *Short IV*, 12 Cl.Ct. at 44.[6] As the law stood when counsel brought the *Heller, Ehrman* action in August 1991, the plaintiffs were not entitled to the escrow fund. The law remains the same today. Therefore there was no conflict arising out of plaintiffs' counsel suing for an interest in the Settlement Fund.

Even if the U.S. Court of Appeals for the Federal Circuit were to reverse this court's 1987 decision and hold that the plaintiffs were entitled to the entire escrow fund, no court could award that particular fund. The escrow fund no longer exists. Pursuant to the terms of the Settlement Act, the escrow fund was converted into the Settlement Fund, and the Settlement Fund was distributed among various tribes and Indians. The *Short* plaintiffs would only be able to receive an award of damages from the government.

Counsel have not advanced theories in this case that are inconsistent with those they advanced in the *Heller, Ehrman* litigation. In this court, counsel have argued that their clients are entitled to damages from the April 15, 1991 per capita distribution on the grounds that it was discriminatory and occurred prior to the final judgment in this case. The argument did not depend on the status of the Settlement Fund as a tribal trust fund. Therefore it was not inconsistent to argue, as they did

---

**5.** The portion of the *Heller, Ehrman* award granting 6.5% of the *Short* plaintiffs' distribution is the percentage to which counsel were entitled pursuant to their attorney's fee contract with the plaintiffs. The defendant does not contend that this portion of the award created any conflict of interest.

**6.** In *Short IV*, the court held that plaintiffs were entitled to damages from the United States government, not to the escrow fund itself. 12 Cl.Ct. at 44.

in *Heller, Ehrman,* that the Settlement Fund was not a tribal trust fund.

Finally, defendant claims that Jessie Short herself opposed her counsel's position in *Heller, Ehrman.* She has apparently filed an affidavit stating in essence that she disagreed with her counsel's strategy of lobbying against the Settlement Act. While the plaintiffs' perceptions are very important to the court, Ms. Short has not accused counsel of unethical conduct. It appears that her disagreements with counsel are differences of opinion on tactical judgments. In a case involving over 3,000 plaintiffs, differences of this kind are bound to occur. In sum, plaintiffs' counsel do not have a conflict of interest which would disqualify them from this litigation.

*April 15, 1991 Per Capita Distribution*

■ Next, the court addresses whether it should include the April 15, 1991 per capita distribution in the final judgment. On April 15, 1991, the Hoopa Valley Tribe authorized a $5,000 per capita distribution to its members. No Indians of the Reservation outside of the Hoopa Valley Tribe shared in that per capita distribution. The plaintiffs claim that the April 15, 1991 per capita distribution was discriminatory and should be included in the final judgment with all other discriminatory per capita distributions. The defendant and the defendant-intervenor argue that section 7 of the Settlement Act permitted the April 15, 1991 per capita distribution and made it lawful. The court finds that the Settlement Act authorized this per capita distribution, and it shall not be included in the judgment.

The critical section of the Settlement Act is section 7(b), which provides:

Funds divided pursuant to this section and any funds apportioned to the Hoopa Valley Tribe and the Yurok Tribe pursuant to subsections (c) and (d) of section 4 shall not be distributed per capita to any individual before the date which is 10 years after the date on which the division is made under this section: *Provided, however,* That if the Hoopa Valley Business Council shall decide to do so it may distribute from the funds apportioned to it a per capita payment of $5,000 per

member, pursuant to the Act of August 2, 1983 (25 U.S.C. 117a et seq.).

§ 7(b), 102 Stat. at 2931–32 (emphasis in original).

The plain language in section 7 appears to permit the April 15, 1991 per capita distribution. Nevertheless, the plaintiffs argue that section 7(b) does not *authorize* this per capita distribution, but merely *permits* the distribution if the distribution is lawful under the law as it existed prior to the Settlement Act. Plaintiffs claim that, under *Short I,* they are entitled to damages for any discriminatory per capita distributions made prior to the entry of final judgment. Because the April 15, 1991 per capita distribution was discriminatory, and because no final judgment has yet been entered, plaintiffs contend that they are entitled to damages from the April 15, 1991 per capita distribution.

The plaintiffs' interpretation is untenable, because it would make the April 15, 1991 per capita distribution unlawful under any circumstances. According to their argument, the per capita distribution was unlawful because it went only to Hoopa Indians. Yet under the Settlement Act it would also have been unlawful to distribute the funds per capita to anyone other than Hoopa Indians. The first clause in section 7(b) prohibits per capita distributions from the apportionments of the Settlement Fund for 10 years from the date of the Settlement Act's division. To solve this difficulty, the plaintiffs suggest that section 7 only applies to Reservation income earned *after* the passage of the Settlement Act.

The difficulty with the plaintiffs' argument is that the Settlement Act does not make any distinctions between pre-Act escrow funds and post-Act income. The Act transfers the escrow funds "together with all the accrued income thereon" to the Settlement Fund without regard to the date the escrow funds were earned. § 4(a)(1). The Act divides portions of the Settlement Fund without regard for the date the funds were earned. § 4(c)-(d). The first clause in section 7(b) treats all funds the same; it states that neither tribe shall make per capita distributions of "*any* funds appor-

tioned." § 7(b). The second clause states that the Hoopa Valley Tribe "may distribute from the funds apportioned to it a per capita payment of $5,000 per member." *Id.* The Act's unqualified treatment of the escrow funds suggests that Congress intended no distinctions between funds earned prior to the Act or after the Act.

The only reasonable construction of section 7 is that it changes the nature of the government's discretion to make per capita distributions from the escrow fund. Under the law of this case, it is within the Secretary of Interior's discretion to make per capita distributions. *Short IV*, 12 Cl.Ct. at 44. The Secretary's discretion is constrained by statutes including 25 U.S.C. §§ 117a and 407, and by the fiduciary relationship between the Secretary and the Indians. *Short III*, 719 F.2d at 1135–37. The Settlement Act is simply another statute that constrains the Secretary's discretion in new ways. Section 4 directs the Secretary to create the Settlement Fund and divide it, while section 7 specifies when per capita distributions may be made. Section 7 makes all per capita distributions from the apportionments unlawful for 10 years, except this one, which it made lawful.

Section 3 is consistent with this construction. It states that "[n]othing in this Act shall affect, in any manner, the entitlement established under decisions of the United States Claims Court in the *Short* cases or any final judgment which may be rendered in those cases." § 3, 102 Stat. at 2927. The section does not define the point at which an entitlement is "established" for the purposes of the Act; therefore the court interprets it to incorporate the law of *Short* to pinpoint when an entitlement is established. *Short IV* essentially determined when an entitlement is established; this court held that a right to damages arises on the date of an unlawful per capita distribution. 12 Cl.Ct. at 44. The date of this distribution was April 15, 1991. On that date, the Settlement Act governed the

Secretary's discretion to make per capita distributions from the Settlement Fund, and section 7 permitted this one distribution. Therefore to hold that the April 15, 1991 per capita distribution was made lawful by the Settlement Act does not interfere with the entitlements established in the *Short* cases.[7]

The court's construction furthers the purpose of the Settlement Act to settle the disputes over unallotted Reservation property. Moreover, the Senate committee report on the Settlement Act reflects some congressional intention that the Settlement Act supersede the *Short* case, to the extent there is a conflict between them. That report states:

> While the Committee does not believe that this legislation, as a prospective settlement of this dispute, is in any way in conflict with the law of the case in the *Short* cases, to the extent there is such a conflict, it is intended that this legislation will govern.

S.Rep. 100–564, 100th Cong., 2d Sess. 19 (1988). The Federal Circuit's decision in *Short III* reinforces this conclusion. That court stated:

> We also agree [with the trial judge] "that the decision reached in this court ... will obtain only for the years until final judgment, and for the years to come *while the situation in the Reservation remains the same* subject of course to births and deaths."

*Short III*, 719 F.2d 1133, 1143 (Fed.Cir. 1983) (emphasis supplied). Clearly, the situation on the Reservation changed with the passage of the Settlement Act.[8]

For these reasons, the court finds that the plaintiffs are not entitled to damages for the April 15, 1991 per capita distribution.

## CONCLUSION

Because plaintiffs' counsel did not seek a pecuniary interest adverse to the interests

---

7. Section 3 reflects Congress' general intention not to change the government's liability for damages arising out of unlawful per capita distributions made prior to the Settlement Act.

8. This court does not read the Federal Circuit's opinion to state that Congress does not have authority to change the situation on the Reservation prior to a judgment in this case.

of their clients, the court finds no conflict of interest. The court also finds that the government made the April 15, 1991 per capita distribution pursuant to the requirements of the Settlement Act. Therefore the plaintiffs are not entitled to recover damages for that per capita distribution, and the defendant's motion for partial summary judgment on the April 15, 1991 per capita distribution is GRANTED.