50 F.3d 994
 Jessie SHORT and 104 named Plaintiffs,
and
Rethema I. Barber and 2,499 other named Plaintiffs,
Plaintiffs/Cross-Appellants,
and
Dennis W. Barnes and the remaining 1,139 Plaintiffs, Plaintiffs,
v.
The UNITED STATES, Defendant-Appellant,
v.
The HOOPA VALLEY TRIBE OF INDIANS, Defendant-Appellee/Cross-Appellee.
 Nos. 93-5193, 93-5208, 93-5209, 94-5016, 94-5020 and 94-5025.
 United States Court of Appeals,
Federal Circuit.
 March 14, 1995.
 
 Edward J. Shawaker, Atty., Environment & Nat. Resource Div., Washington, DC, argued, for defendant-appellant. With him on the brief, were Lois J. Schiffer, Acting Asst. Atty. Gen., Environment & Nat. Resources Div. and Jacques B. Gelin, Atty. Also on the brief, was Myles E. Flint, Deputy Asst. Atty. Gen., Environment & Nat. Resources Div.
 William K. Shearer, Duke, General, Shearer & Bregante, San Diego, CA, argued, for plaintiffs/cross-appellants, Short & Barber. William C. Wunsch, Falkner, Sheehan & Wunsch, San Francisco, CA, argued, for plaintiffs/cross-appellants, Short & Barber. With him on the brief, were Weyman I. Lundquist, Robert S. Venning and Michael S. Greenberg, Heller, Ehrman, White & McAuliffe, San Francisco, CA.
 Thomas P. Schlosser, Pirtle, Morisset, Schlosser & Ayer, Seattle, WA, argued, for defendant-appellee/cross-appellee, The Hoopa Valley Tribe of Indians. Evelyn M. Conroy, Jolles, Bernstein & Garone, P.C., Portland, OR, argued, for defendant-appellee/cross-appellee.
 Before MAYER, MICHEL and RADER, Circuit Judges.
 Opinion for the court filed by Circuit Judge MAYER. Dissenting in part opinion filed by Circuit Judge MICHEL.
 MAYER, Circuit Judge.
 
 
 1
 The United States appeals a judgment of the United States Court of Federal Claims, No. 102-63 (July 29, 1993), ordering the United States to pay the plaintiffs certain sums plus interest. The plaintiffs, several thousand American Indians, cross-appeal certain judgments and orders relating to the proper measure of their damages; they also contest the court's decision to dismiss the claims of certain plaintiffs who died after the suit was filed but before being named in the amended petition. We affirm.
 
 Background
 
 2
 We provide only a brief synopsis of the facts of this case because they are set forth at great length in the many proceedings over the past thirty-two years. See, e.g., Short v. United States, 12 Cl.Ct. 36, 38-42 (1987) ("Short IV ").
 
 
 3
 The Bureau of Indian Affairs of the Department of the Interior ("BIA") manages trust funds in the names of certain Indian tribes and reservations. One such trust fund holds proceeds from sales of timber and other resources of the Hoopa Valley Reservation in California. Beginning in the 1950s, the United States managed timbering activities on the reservation that produced significant revenue--over one million dollars per year as of 1972.
 
 
 4
 Members of the Hoopa Valley Tribe, which was formed in 1950, make up the minority of the Indians living on the Hoopa Valley Reservation. The majority of those living on the reservation are of Yurok descent. See Short v. United States, 486 F.2d 561, 562, 202 Ct.Cl. 870 (1973) ("Short I "); Short IV, 12 Cl.Ct. at 38. Beginning in 1955, the United States made per capita payments from the proceeds of the Hoopa Valley Reservation to members of the Hoopa Valley Tribe, but not to other Indians of the Reservation, who were not, until recently, members of any organized tribe ("nonmembers"). See Short IV, 12 Cl.Ct. at 38 ("To date, efforts to organize a Yurok tribal government have been unsuccessful, largely because of this case."); id. at 40 ("[O]n the Hoopa Valley Reservation, ... the only formally organized tribal government includes only a fraction of the Indians for whom the Reservation was established...."). In 1963, several thousand nonmembers filed suit against the United States in the Court of Claims, alleging that the United States had breached its fiduciary duty by distributing portions of the Hoopa Valley Reservation trust fund per capita only to members of the Hoopa Valley Tribe and to the Hoopa Valley Tribe itself. In 1973, the Court of Claims upheld the plaintiffs' cause of action and held the United States liable for discriminatory per capita payments beginning in 1957.[1] See Short I, 486 F.2d at 562.
 
 
 5
 From 1973 to the present, the Court of Claims, the Claims Court/Court of Federal Claims, and this court have issued many decisions and orders clarifying the scope of the government's liability and the extent of the plaintiffs' damages. In 1981, the Court of Claims denied the government's motion to substitute the as-yet unformed "Yurok Tribe" for the plaintiffs, and denied the Hoopa Valley Tribe's motion to dismiss the suit on the ground that it presented a nonjusticiable political question. See Short v. United States, 661 F.2d 150, 154-59, 228 Ct.Cl. 535 (1981) ("Short II "). In 1983, this court rejected a challenge to the jurisdiction of the Court of Claims and the Claims Court by the government and the Hoopa Valley Tribe, and affirmed the trial judge's standards for determining whether the individual plaintiffs were "Indians of the Reservation" who were entitled to recover. See Short v. United States, 719 F.2d 1133, 1137-43 (Fed.Cir.1983) ("Short III ").
 
 
 6
 Despite the 1973 liability decision, the BIA continued to make payments only to Hoopa Valley Tribe members. The only difference was that, following the 1973 decision, the BIA held seventy percent of the unallotted Hoopa Valley Reservation income in an escrow fund and made payments only out of the remaining thirty percent of the reservation proceeds. At the time, the population of the reservation was roughly thirty percent Hoopa Valley Tribe members and seventy percent nonmembers. In 1987, the Court of Federal Claims held that the plaintiffs had no right to the undistributed "seventy percent fund" until the Secretary of the Interior took some action related to those funds, such as authorizing payments from it. See Short IV, 12 Cl.Ct. at 44. The court also held that the plaintiffs' damages for wrongful exclusion from the per capita distributions to Hoopa Valley Tribe members should be calculated by dividing the total amount of money previously distributed per capita by the total number of eligible "Indians of the Reservation," including those who already received payment. See id. at 41. The plaintiffs claimed that they should receive an additional recovery for non-per capita distributions to the Hoopa Valley Tribe, but the trial court held that "[t]ribal or communal assets that have not been individualized may not be awarded" to individuals suing under 28 U.S.C. Sec. 1491. Short IV, 12 Cl.Ct. at 40. The court awarded the plaintiffs simple interest from the date of each distribution, based on the statutes governing the handling of tribal trust funds. See id. at 42-44; see also Short v. United States, 25 Cl.Ct. 722, 724-28 (1992) ("Short V ") (denying the government's request for reversal of Short IV and reaffirming the interest award); Short v. United States, No. 102-63, at 2-4 (Ct.Fed.Cl. Sept. 15, 1992) (order determining the rate of interest); Short v. United States, 28 Fed.Cl. 590 (1993) (order clarifying the amount of interest to which plaintiffs were entitled).
 
 
 7
 In 1988, with the seventy-percent fund still undistributed, Congress passed the Hoopa-Yurok Settlement Act, Pub.L. No. 100-580, 102 Stat. 2924 (1988) (codified at 25 U.S.C. Secs. 1300i to 1300i-11 (1988 & Supp. V 1993)). This act divided the Hoopa Valley Reservation into two separate reservations: the Hoopa Valley Reservation and the Yurok Reservation. The seventy-percent fund was combined with other funds to form a "Settlement Fund," and Congress required the Secretary to apportion this fund between the Hoopa Valley Tribe and the Yuroks roughly in proportion to population. With the exception of a one-time per capita payment of $5000 to Hoopa Valley Tribe members, the Secretary was prohibited from making any per capita distributions from the apportioned funds for ten years. See 25 U.S.C. Sec. 1300i-6(b). In April 1991, the $5000 payment was distributed to Hoopa Valley Tribe members. In 1993, the Court of Federal Claims held that the plaintiffs were not entitled to damages for the 1991 per capita distribution, because it was specifically authorized by the Settlement Act. See Short v. United States, 28 Fed.Cl. 590, 594-95 (1993) ("Short VI "). In 1989, the Claims Court denied the plaintiffs' claim for group damages under 28 U.S.C. Sec. 1505 (1988 & Supp. V 1993). See Short v. United States, No. 102-63, at 3-10 (Cl.Ct. July 25, 1989) (order).
 
 
 8
 On July 29, 1993, the Court of Federal Claims disposed of all claims in a final judgment awarding each successful plaintiff a per capita share arrived at by dividing the total amount disbursed to the tribe members by the new total number of Indians of the Reservation. The court also awarded each plaintiff interest beginning with the dates of the distributions to the members. It also held that the plaintiffs were not entitled to a share of the disbursements to the tribe directly because they benefited from them, and that the plaintiffs were not yet entitled to any amounts still being held in escrow. Finally, the court dismissed the claims of certain deceased Indians who died after the suit was filed but before being named in the petition.
 
 Discussion
 
 9
 A. Interest as Part of the Plaintiffs' Damages
 
 
 10
 The government's appeal presents a single issue: whether the Court of Federal Claims erred in ordering the United States to pay interest to each successful plaintiff from the date of each per capita distribution to the members of the Hoopa Valley Tribe. See Short IV, 12 Cl.Ct. at 43. The government continues to argue on appeal that no statute entitles the plaintiffs to prejudgment interest on their awards. See 28 U.S.C. Sec. 2516(a) (1988 & Supp. V 1993) ("Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof."). Although we agree that no statute entitles the plaintiffs to prejudgment interest, we see the investment statutes as providing a basis for the award of interest as part of the plaintiffs' damages. See 25 U.S.C. Secs. 161a, 161b, 162a (1988); Short IV, 12 Cl.Ct. at 43; Short V, 25 Cl.Ct. at 727.
 
 
 11
 Under 25 U.S.C. Secs. 161a, 161b, and 162a, simple interest is paid on Indian Money, Proceeds for Labor ("IMPL") accounts.[2] Section 161a, for example, provides that "[a]ll funds ... held in trust by the United States ... to the credit of Indian tribes, upon which interest is not otherwise authorized by law, shall bear simple interest at the rate of 4 per centum per annum." 25 U.S.C. Sec. 161a; see also id. Sec. 161b ("All tribal funds arising under Sec. 155 ... shall bear simple interest at the rate of 4 per centum per annum...."); id. Sec. 162a (providing for the investment of tribal funds in bank accounts at interest rates higher than 4% per annum). The government acknowledges that these statutes provide for the payment of interest on trust funds held by the United States for the benefit of Indians. It argues, however, that interest is payable only on money still held in such a trust fund. We do not agree. These statutes, in conjunction with the government's fiduciary duty to Indian tribes, see United States v. Mitchell, 463 U.S. 206, 224-26, 103 S.Ct. 2961, 2971-73, 77 L.Ed.2d 580 (1983) ("Mitchell II "), give the plaintiffs a substantive right to damages, including interest as explained below.
 
 
 12
 Mitchell II held that 25 U.S.C. Sec. 407, which governs the sale of timber on unallotted lands such as the Hoopa Valley Reservation, and the other timber-management statutes "establish the 'comprehensive' responsibilities of the Federal Government in managing the harvesting of Indian timber." Id. at 222, 103 S.Ct. at 2971 (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980)). The regulations promulgated under these statutes establish a fiduciary relationship between the United States and the Indians. See Mitchell II, 463 U.S. at 224-26, 103 S.Ct. at 2971-73. Thus, the statutes and regulations "can fairly be interpreted as mandating compensation by the Federal Government for damages sustained" for breach of fiduciary duty. Id. at 226, 103 S.Ct. at 2972-73; accord Short III, 719 F.2d at 1135.
 
 
 13
 Such a breach of fiduciary duty occurs when funds held in trust are mishandled, which can arise in a number of ways. For example, the funds might be wrongfully disbursed. See, e.g., Short III, 719 F.2d at 1135 (holding, on the basis of Mitchell II, that the pervasive statutory scheme present here creates an actionable fiduciary duty when the Secretary wrongfully distributes timber proceeds in a discriminatory fashion). Or, the funds might be misappropriated or mismanaged.
 
 
 14
 Once a breach of the government's fiduciary duty is established, the question becomes the appropriate measure of damages. In Peoria Tribe v. United States, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968), the Court recognized that interest may be appropriately included in a damage award against the United States for breach of its obligations to an Indian tribe. That case arose under a treaty that obligated the government to dispose of certain tribal lands at a public auction and accrue interest on the proceeds until distribution. See id. at 469, 88 S.Ct. at 1137-38. The government violated the treaty by selling most of the land privately at lower prices than it would have received at a public auction. See id. at 469-70, 88 S.Ct. at 1137-38. The tribe sued both for the deficiency in the amount received (approximately $170,000) and for the interest that would have accrued had the government received that amount. See id. The Supreme Court reversed a Court of Claims judgment denying interest to the tribe. The Court acknowledged that the United States is generally "not liable for interest on claims against it," id. at 470, 88 S.Ct. at 1138, but considered interest to be part of a proper damage award. See id. at 471, 88 S.Ct. at 1138-39 ("The issue ... concerns the measure of damages for the treaty's violation in the light of the Government's obligations under that treaty.").
 
 
 15
 Here, as in Peoria Tribe, the government had a statutory obligation to hold funds for certain Indians. The government was further obligated to accrue interest on those amounts until distribution. See 25 U.S.C. Secs. 161a, 161b, 162a. The government violated its obligations by disbursing funds belonging to the plaintiffs to the Hoopa Valley Tribe members instead, to the fiscal detriment of the plaintiff non-Hoopa Indians. Therefore, the government owes the plaintiffs interest, not as interest on their damages, but as part of the damage award itself. See Peoria Tribe, 390 U.S. at 472, 88 S.Ct. at 1139; see also Cheyenne-Arapaho Tribes of Indians v. United States, 512 F.2d 1390, 1393-94, 1396, 206 Ct.Cl. 340, (1975) (holding that the government was obligated to pay interest when it mismanaged funds that were part of the same IMPL accounts at issue in this case).
 
 
 16
 Were we to accept the government's position, that interest would be payable only on money still held in trust, the principles of Mitchell II would apply only in the narrow circumstance of refusal to disburse funds payable to Indian tribes. There is no support in that case or our cases for such a limitation; indeed, the Court of Claims judgment affirmed by the Supreme Court in Mitchell II was that a damage recovery under 25 U.S.C. Secs. 161b and 162a for mismanagement of timberlands and their proceeds should include interest. See Mitchell v. United States, 664 F.2d 265, 275, 229 Ct.Cl. 1 (1981). Nor would such a result be consistent with the government's high fiduciary duty to the Indian tribes. See, e.g., Seminole Nation v. United States, 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942) (holding the United States to the "most exacting fiduciary standards"); American Indians Residing on the Maricopa-Ak Chin Reservation v. United States, 667 F.2d 980, 990, 229 Ct.Cl. 167 (1981) ("The standard of duty as trustee for Indians is not mere reasonableness, but the highest fiduciary standards."); see also Felix S. Cohen, Handbook of Federal Indian Law 541 (1982 ed.) ("Litigation in timber cases has resulted in the imposition of strict fiduciary duties on the United States in its administration of tribal timber operations."). Instead, we agree with the Court of Federal Claims that "[t]he government may not eliminate liability for interest mandated by statute simply by wrongfully disposing of the principal to others." Short IV, 12 Cl.Ct. at 43; see also United States v. Gila River Pima-Maricopa Indian Community, 586 F.2d 209, 216, 218 Ct.Cl. 74 (1978) ("Interest as damages may not be awarded absent a treaty or statute specifically calling for interest to be paid.... Such a statute exists for 'Indian Moneys, Proceeds of Labor' (IMPL) funds, and ... interest should be awarded for payments made from such funds."); cf. Coast Indian Community v. United States, 550 F.2d 639, 655, 213 Ct.Cl. 129 (1977) (25 U.S.C. Secs. 161 and 161a are statutory exceptions to the general rule that interest "from the date that the claim arises until date of judgment" is not awarded in breach of trust cases). In other words, the amount of interest that, by statute, should have been accumulating on funds wrongfully disbursed by the government is properly viewed as part of the "damages resulting from a breach of the trust." Mitchell II, 463 U.S. at 226, 103 S.Ct. at 2973. This is appropriate because the plaintiffs have not received the benefit over the years of the funds that were wrongfully disbursed to others. As the court below recognized, we are to assume that, but for the discriminatory payments to the Hoopa Valley Tribe members, the plaintiffs' rightful shares of the timber proceeds would still be accruing interest as provided by statute. See Short IV, 12 Cl.Ct. at 43.
 
 
 17
 This result is not premised on notions of "fairness" to the plaintiffs; rather, it is the proper measure of damages for wrongfully disbursed funds under this statutory scheme. Where, as here, IMPL funds were at one time held in trust accounts in which they were statutorily required to accumulate simple interest, see Short I, 486 F.2d at 571, such interest must be part of the plaintiffs' damage award.[3] See, e.g., Manchester Band of Pomo Indians, Inc. v. United States, 363 F.Supp. 1238, 1244-48 (N.D.Cal.1973); Menominee Tribe of Indians v. United States, 101 Ct.Cl. 10, 18, 1944 WL 3683 (1944). Thus, under Peoria Tribe, the plaintiffs are entitled to their shares of the timber proceeds plus interest from the date of each distribution, which was when the breach of fiduciary duty occurred, "until the money is paid over." Peoria Tribe, 390 U.S. at 472, 88 S.Ct. at 1139 (quoting United States v. Blackfeather, 155 U.S. 180, 193, 15 S.Ct. 64, 69, 39 L.Ed. 114 (1894)).
 
 B. Takings Claim for Compound Interest
 
 18
 As an alternative to their statutory argument for prejudgment interest, plaintiffs present a claim for compound interest on the ground that their exclusion from distributions of Hoopa Valley Reservation trust monies constituted a taking for which just compensation is required. There was no error in the Court of Federal Claims's refusal to adjudicate this claim.
 
 
 19
 A claimant under the Fifth Amendment must show that the United States, by some specific action, took a private property interest for public use without just compensation. See U.S. Const. amend. V. The government action upon which the takings claim is premised must be authorized, either expressly or by necessary implication, by some valid enactment of Congress. See, e.g., Langenegger v. United States, 756 F.2d 1565, 1572 (Fed.Cir.1985); Southern Cal. Fin. Corp. v. United States, 634 F.2d 521, 523, 225 Ct.Cl. 104 (1980). As discussed above, the Secretary's actions in making per capita payments only to Hoopa Valley Tribe members were unauthorized. See Short III, 719 F.2d at 1137 (characterizing the Secretary's distributions as "illegal"). The plaintiffs are entitled to the damages awarded by the Court of Federal Claims because the Secretary failed to operate within the framework established by Congress for the administration of reservation revenues. See Short IV, 12 Cl.Ct. at 40-41. Thus, the factual predicate of the plaintiffs' Fifth Amendment argument is contradicted by the findings of the Court of Federal Claims, with which we agree.
 
 
 20
 At times the plaintiffs appear to be alleging that the United States "took" their property interest in the timber itself by transferring their rights in the timber resources of the reservation to the Hoopa Valley Tribe and its members. Such an argument, that an interest in the land or timber itself was taken, is unavailable to the plaintiffs, until 1988, when Congress divided the Hoopa Valley Reservation into two parts. See Hoopa-Yurok Settlement Act of 1988, Pub.L. No. 100-580, codified at 25 U.S.C. Secs. 1300i to 1300i-11 (1988). (Those who waived rights in the Reservation received money.) We decline to consider this issue because there are currently three cases pending in the Court of Federal Claims in which essentially the same plaintiffs assert that Congress's disposition of undistributed Hoopa Valley Reservation funds and land as part of the Hoopa-Yurok Settlement Act constitutes a taking of property requiring just compensation. Karuk Tribe of Calif. v. United States, No. 90-3993 (Ct.Fed.Cl.); Yurok Indian Tribe v. United States, No. 92-173L (Ct.Fed.Cl.); Ammon v. United States, No. 91-1432 (Ct.Fed.Cl.). Whatever we would say here would be advisory and devoid of a record.
 
 
 21
 C. Dismissal of Certain Deceased Plaintiffs' Claims
 
 
 22
 The plaintiffs claim that the Court of Federal Claims erred in dismissing the claims of certain Indians who died after the suit was filed on March 27, 1963, but before their names were added to the amended petition filed on March 6, 1967. See Short v. United States, No. 102-63, at 2 (Ct.Fed.Cl. July 29, 1993) (final order directing the entry of judgments) (amended Sept. 2, 1993); Short v. United States, No. 102-63, at 1-3 (Cl.Ct. July 10, 1986) (order dismissing certain deceased claimants with prejudice); Short v. United States, No. 102-63, at 2-3 (Cl.Ct. May 27, 1986) (order denying a motion for reconsideration of an order of April 10, 1985); Short v. United States, No. 102-63, at 3-4 (Cl.Ct. Apr. 10, 1985) (order).
 
 
 23
 We affirm the order dismissing the claims of these potential plaintiffs. The trial court correctly found that, under the unique procedures developed for this case, potential claimants who were not named in the petition would not have been bound by the judgment and thus were not parties. See Short v. United States, No. 102-63, at 2 (Cl.Ct. May 27, 1986) (order); Short v. United States, No. 102-63, at 4 (Cl.Ct. Apr. 10, 1985) (order).
 
 
 24
 The plaintiffs are correct to point out that the Court of Claims did not have formal class action rules in 1963, but developed such procedures on a case-by-case basis. See Quinault Allottee Ass'n v. United States, 453 F.2d 1272, 1275-76, 197 Ct.Cl. 134 (1972); see also Short v. United States, No. 102-63, at 4 (Cl.Ct. Apr. 10, 1985) (order) (the court "never adopted the class action device defined by Rule 23 of the Federal Rules of Civil Procedure"). Having acknowledged this, however, the plaintiffs fail to accord proper weight to the procedural rulings of this case. For example, the Court of Federal Claims did not find that a judgment of eligibility had been made for all of the deceased claimants, see Short v. United States, No. 102-63, at 2-3 (Cl.Ct. May 27, 1986) (order). The lack of a judgment of eligibility supports the conclusion that these claimants would not have been bound by a judgment in the case.
 
 Conclusion
 
 25
 We have reviewed the other arguments of the plaintiffs relating to the proper measure of the damages to be awarded and do not find them persuasive. Accordingly, the judgment of the Court of Federal Claims is affirmed.
 
 
 26
 AFFIRMED.
 
 
 27
 MICHEL, Circuit Judge, dissenting.
 
 
 28
 I join the majority opinion, except with respect to the prejudgment interest award, as to which I respectfully dissent. The trial court concluded that the plaintiffs are entitled to prejudgment interest, having interpreted three sections of Title 25 of the United States Code as waivers of sovereign immunity from liability on that score. Short V, 25 Cl.Ct. 722, 727 (1992); Short IV, 12 Cl.Ct. 36, 43 (1987). This conclusion, at odds with decisions of the Supreme Court and this court alike, awards to plaintiffs monies to which they have demonstrated no entitlement. It should not go uncorrected.
 
 Discussion
 
 29
 All the parties to this litigation acknowledge that, as a matter of both statutory and case law, the Court of Federal Claims may not compel the United States to pay interest on a judgment for damages in a non-contract case unless a statute clearly authorizes the payment of such interest. 28 U.S.C. Sec. 2516(a) (1988 and Supp.V 1993) ("Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof."); Library of Congress v. Shaw, 478 U.S. 310, 314, 106 S.Ct. 2957, 2961, 92 L.Ed.2d 250 (1986) ("In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award.") (emphasis added). Indeed, the roots of this legal principle run deep, reaching back to both the creation of the United States Court of Claims and the late 19th century decisions of the Supreme Court. See Act of Mar. 3, 1863, ch. 92, Sec. 7, 12 Stat. 765, 766 (1863) ("[N]o interest shall be allowed on any claim up to the time of the rendition of the judgment by said court of claims, unless upon a contract expressly stipulating for the payment of interest...."); United States ex rel. Angarica v. Bayard, 127 U.S. 251, 260, 8 S.Ct. 1156, 1160-61, 32 L.Ed. 159 (1888) ("[T]he United States are not liable to pay interest on claims against them, in the absence of express statutory provision to that effect."); Tillson v. United States, 100 U.S. 43, 47, 25 L.Ed. 543 (1879) (same).
 
 
 30
 The rule against prejudgment interest awards against the United States absent clear statutory authorization for the payment of such interest "provides an added gloss of strictness" on the usual rule that waivers of sovereign immunity are to be construed strictly in favor of the sovereign. Shaw, 478 U.S. at 318, 106 S.Ct. at 2960. As the Supreme Court has cautioned,
 
 
 31
 there can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed.
 
 
 32
 Id. (quoting United States v. New York Rayon Importing Co., 329 U.S. 654, 659, 67 S.Ct. 601, 603-04, 91 L.Ed. 577 (1947)). Congress has amply demonstrated its ability to waive sovereign immunity from awards of prejudgment interest by such express terms. See, e.g., 28 U.S.C. Sec. 2411 (1988) ("In any judgment of any court rendered ... for any overpayment in respect of any internal-revenue tax, interest shall be allowed ... from the date of the payment or collection thereof to a date preceding the date of the refund check by not more than thirty days, such date to be determined by the Commissioner of Internal Revenue."); 40 U.S.C. Secs. 258a, 258e-1 (1988) (Declaration of Taking Act, providing for prejudgment interest in eminent domain cases). We cannot relax this rule of strict construction, nor assume that Congress has lost its power to speak clearly on the subject, simply because we face sympathetic plaintiffs.
 
 
 33
 None of the statutes that the trial court cited and on which the plaintiffs rely contain the affirmative and unequivocal language necessary to entitle them to an award of interest running from the date of wrongful distribution to the date of judgment. The code sections at issue are three: 25 U.S.C. Secs. 161a, 161b, and 162a (1988). To read them is to know that they do not waive the government's immunity from an award of prejudgment interest.[1] Indeed, we held as much regarding 25 U.S.C. Sec. 161a in Rogers v. United States, 877 F.2d 1550, 1555-56 (Fed.Cir.1989), as did our predecessor court regarding all three sections in Mitchell v. United States, 664 F.2d 265, 274-75, 229 Ct.Cl. 1 (1981), aff'd, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).
 
 
 34
 In Mitchell, the Court of Claims, one of our predecessor courts, held that 25 U.S.C. Secs. 406-407 (1976), governing the sale of timber on unallotted tribal lands, waived the government's immunity from suit for damages due to an alleged breach of its fiduciary duty in the management of such Indian property. 664 F.2d at 271. The court described the limit of recovery under these sections as follows: "[P]laintiffs can recover the difference between the actual proceeds and the greatest appropriate revenue which should have been obtained." Id. The plaintiffs in Mitchell, like those in the case at bar, also claimed entitlement to prejudgment interest on their damages awards under sections 161a, 161b, and 162a. Id. at 274. The court rejected this claim for interest, reasoning that, while "proceeds actually paid to plaintiffs under [sections 406 and 407] obviously should include interest which should have been earned or allowed on those underlying proceeds,"[2] interest could not be paid on any damages the claimants might recover because "[t]hose sums or their equivalent were never held by the Government for plaintiffs, were not subject to the specific interest provisions we have just discussed, and there is no statute awarding back-interest on such unpaid compensation now awarded by the court in this suit." Id. at 275. Despite the majority's refusal to acknowledge it, majority op. at 999, Mitchell not only provides "support" for the government's position in this case, it compels our assent to that position.
 
 
 35
 Our holding in Rogers conforms to Mitchell in a factual setting that cannot be distinguished from the instant case. In Rogers, we recounted the facts as follows:
 
 
 36
 All of the claimants in whose favor the district court entered judgment contend that, in addition to the $5,162.52 they received, they were entitled to interest on that amount from the date of the original distribution of the Northern Paiute fund in April 1980. They state that the government held the funds appropriated to make the Northern Paiute payments as trust funds, note that 25 U.S.C. Sec. 161a required the government to invest all funds it held as trustee for Indian tribes in public interest-bearing debt securities, and conclude that because they were wrongfully excluded from the Northern Paiute trust fund, they are entitled to the interest the money would have earned.
 
 
 37
 The government states, and the claimants do not deny, that the funds Congress appropriated to pay the Northern Paiute awards were invested and drew interest [from 1961] until their distribution [in 1980], and that the $5,162.52 distributed to each participant in the fund included interest earned to the date of distribution. Since each of the appellants received that same amount, they received the interest earned by the trust fund to the time of distribution.
 
 
 38
 What the appellants are seeking is additional interest from the time of distribution to the date of judgment. The district court held, however, that because the fund had been distributed to the beneficiaries in 1980, there were no trust funds for the [wrongfully excluded] Northern Paiutes that could have earned interest.
 
 
 39
 877 F.2d at 1555-56. We affirmed the district court's conclusion, reasoning, as it did, that "no contract, treaty, or Act of Congress that the appellants have cited, or of which we are aware, ... expressly, or even by implication, provides for the payment of interest on the awards the district court made to the appellants." Id. at 1556. No intervening change in positive law has undermined our holding in Rogers, and, though fidelity to it surely requires reversal of the trial court's prejudgment interest award in this case, the majority prefers a result more "consistent with the government's high fiduciary duty to the Indian tribes." Majority op. at 999. However high the executive's fiduciary duty to the Indian tribes, it should not get the better of our duty to follow precedent.
 
 
 40
 Neither Coast Indian Community v. United States, 550 F.2d 639, 213 Ct.Cl. 129 (1977), nor United States v. Gila River Pima-Maricopa Indian Community, 586 F.2d 209, 218 Ct.Cl. 74 (1978), both of which the majority cites, conflict with Mitchell or Rogers. Coast Indian Community arose from allegations that the government had sold Indian trust lands worth approximately $57,000 for only $2,500. 550 F.2d at 641. Having concluded that the government was indeed liable for negligent misvaluation of the land in suit, id. at 654, the Court of Claims turned to the plaintiff's claim for interest from the date the land was sold to the date of payment of judgment in the litigation. Because the record in the case did not indicate whether the $2,500 actually received in payment for the sale had been held in a trust account or, instead, disbursed to or for the benefit of the members of the Coast Indian Community, the court could not then determine whether the government was liable for interest. Id. at 655. It observed, however, that "[i]f the payment received was held in the U.S. Treasury in a trust account for Coast Indians Community members, or if it can be shown that part of a larger realized amount would have been so held, it may be that interest should be awarded under sections 161 and 161a." Id. The holding of Coast Indian Community thus extends no further than Mitchell and provides no support for the majority's decision in this case. In Gila River, a suit to recover monies wrongfully collected, 586 F.2d at 211, rather than wrongfully disbursed, the Court of Claims held that the plaintiffs should recover both the monies wrongfully collected and the interest that accrued on these funds while they were held in an IMPL fund, consistent with section 161b. Id. at 216-17. Again, this result, consistent with Coast Indian Community, Mitchell, and Rogers, provides no support for the majority's decision.
 
 
 41
 Both the Supreme Court's sovereign immunity jurisprudence and our holding in Rogers require that the trial court's decision be reversed to the extent that it awards prejudgment interest on supposed statutory grounds. Short et al. do not allege any mismanagement of the IMPL fund as a result of which less than the statutorily required 4% interest was earned or less than obtainable principal was realized. They allege, instead, that the government breached its duty by wrongfully excluding them from distributions to reservation residents, distributions that included both properly managed principal and satisfactory interest. The majority's opinion fails to observe this critical difference between the instant case and those such as Peoria Tribe and Cheyenne-Arapaho, which involve pre-distribution, rather than post-distribution, interest. Judge Margolis, by contrast, explicitly ruled that he was awarding interest "from the date of each distribution." Short IV, 12 Cl.Ct. at 44 (emphasis added). He clearly did so, however, based on an erroneous supposition that the facts here were as those in cases such as Peoria Tribe: "But for the defendant's wrongful distribution, the plaintiffs' shares of the unallotted income would have continued to accrue interest." Id. at 43. But they would not.
 
 
 42
 The distribution was wrongful because it included too few people, not because it was too early or included too little money. "But for" the wrongfully discriminatory distribution, plaintiffs' shares would have gone to plaintiffs rather than to unjustly augment the awards of others. Those shares would not and could not, as Judge Margolis supposes, have collected interest after disbursement, as the cited statutes require only that interest be paid while money is or should have been in government-controlled bank accounts. Thus, the only interest due the original distributees, and now also the plaintiffs, is that which actually accrued before distribution. It is beyond peradventure that Judge Margolis' manner of calculating damages already included just such interest. Short IV, 12 Cl.Ct. at 41 ("[E]ach qualified plaintiff alive at a given date of distribution will receive a share equal to the total amount of money distributed per capita (principal and interest ), divided by the total number of eligible 'Indians of the Reservation' who received, or should have received, a payment[.]") (emphasis added). Such interest is all the statutes cited by and relied on by the majority authorize. To go still further by authorizing post-distribution, prejudgment interest would require another statute, but neither Judge Margolis nor the majority cites one. Indeed, it does not exist.
 
 
 43
 Short et al. object to this position, arguing that the government's ability to escape liability for prejudgment interest would be fundamentally unfair in this context. Unfairness, if it be, was deliberately legislated. Of course, this is precisely the favored position the "no interest" rule is meant to preserve. The rule's purpose is now, as it has always been, to "permit the Government to occupy an apparently favored position by protecting it from claims for interest that would prevail against private parties." Shaw, 478 U.S. at 315-16, 106 S.Ct. at 2961-62 (internal quotations and citations omitted).
 
 Conclusion
 
 44
 I understand and would like to support the policy argument the majority advances, as eager as we all are to halt the Dickensian march of these 31-year old cases.[3] But such a policy argument cannot overcome the force of precedent requiring that the trial court's prejudgment interest decision be reversed. Therefore, I would reverse-in-part.
 
 
 
 [1]
 Between March 27, 1957, and June 30, 1974, $23,811,963.75 was distributed per capita to tribe members. Between August 6, 1974, and March 7, 1980, per capita payments totalled $5,293,975. The Court of Claims calculated the damages beginning on March 27, 1957, because the suit was filed on March 27, 1963--six years later. See 28 U.S.C. Sec. 2501 (1988 & Supp.V 1993) ("[E]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the [claim] thereon is filed within six years after such claim first accrues.")
 
 
 [2]
 Congress recently amended the statutory provisions that govern the management of Indian trust funds. See American Indian Trust Fund Management Reform Act of 1994, Pub.L. No. 103-412, 108 Stat. 4239. This Act took effect for amounts deposited or invested on or after October 25, 1994. It amends section 162a, inter alia, to provide a non-exclusive list of functions considered part of the Secretary's "proper discharge of the trust responsibilities of the United States." Id. Sec. 101, 108 Stat. at 4240
 
 
 [3]
 Rogers v. United States, 877 F.2d 1550 (Fed.Cir.1989), upon which the government relies for much of its argument against an award of prejudgment interest, is thus a far different case. The funds at issue in Rogers were disbursed from an Indian Claims Commission judgment fund created to compensate the claimants for a taking. See id. at 1552. These funds were never held in an IMPL account and were not subject to the directives of 25 U.S.C. Sec. 161b. Moreover, the funds at issue in Rogers were subject to express statutory restrictions on the payment of interest. See Supplemental Appropriation Act, 1962, Pub.L. No. 87-332, 75 Stat. 733 ("[U]nless otherwise specifically required by law or by the judgment, payment of interest wherever appropriated for herein shall not continue for more than thirty days after the date of approval of this Act."). No such restriction is present here
 
 
 [1]
 According to section 161a, "All funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of Indian tribes shall be invested by the Secretary of the Treasury, at the request of the Secretary of the Interior, in public debt securities with maturities suitable to the needs of the fund involved, as determined by the Secretary of the Interior, and bearing interest at rates determined by the Secretary of the Treasury, taking into consideration current market yields on outstanding marketable obligations of the United States of comparable maturities."
 According to section 161b, "All tribal funds arising under section 155 of this title on June 30, 1930, included in the fund 'Indian Money, Proceeds of Labor', shall, on and after July 1, 1930, be carried on the books of the Treasury Department in separate accounts for the respective tribes, and all such funds with account balances exceeding $500 shall bear simple interest at the rate of 4 per centum per annum from July 1, 1930."
 Finally, section 162a provides, in relevant part, that the "Secretary of the Interior is hereby authorized in his discretion, and under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks to be selected by him the common or community funds of any Indian tribe which are, or may thereafter be, held in trust by the United States and on which the United States is not obligated by law to pay interest at higher rates than can be procured from the banks."
 
 
 [2]
 In this regard, Mitchell accords with Peoria Tribe v. United States, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968), and Cheyenne-Arapaho Tribes of Indians v. United States, 512 F.2d 1390, 206 Ct.Cl. 340 (1975). In all three cases, a treaty or statute established a duty of the United States that the government violated to the fiscal detriment of one or more tribes. Instead of obtaining $X (e.g., market value for a parcel of land sold at public auction), the government breached its duty and accordingly obtained $(X-Y) (e.g., a private sale price greatly discounted from market value). Damages, properly calculated, included both $Y, to make up the difference in principal, and interest on $Y that the government would have been required to pay from the time it wrongfully failed to obtain $Y to the time the total was disbursed. The inclusion of this kind of interest merely makes the complainant whole
 
 
 [3]
 Charles Dickens, Bleak House 52 (Norman Page ed., Penguin Books 1971) (1853) ("Jarndyce and Jarndyce drones on. This scarecrow of a suit has, in course of time, become so complicated that no man alive knows what it means.... Innumerable children have been born into the cause; innumerable young people have married into it; innumerable old people have died out of it.... [B]ut Jarndyce and Jarndyce still drags its dreary length before the Court, perennially hopeless.")